OVEBTON, J.
 

 Byron, W. Bobert, and Eustice Dunn were indicted by the grand jury of the parish of Calcasieu for the murder of Sam E. Duhon. The case was tried only as relates to Byron and W. B. Dunn, the state having elected not to bring Eustice Dunn to trial, when the ease was called. The jury found both Byron and W. B. Dunn guilty as charged, and, upon this verdict, they were sentenced to death. Both have appealed to .this court, and rely upon a number of bills of exception for a reversal of the verdict of the jury and the sentence pronounced against them.
 

 Bills of Exception 1, 2, 3, 5, and 7.
 

 These bills were reserved during the impaneling of the jury, and relate to five challenges, directed against jurors, for cause, and overruled by the court. As defendants exhausted their peremptory challenges in selecting the jury, they present these bills to us for our consideration.
 

 It appears from the bills so reserved that two of the jurors against whom the challenges for cause were directed had made donations to a fund for the relief of the widow and children of the deceased; that three were members of the Ku Klux Klan, of which the deceased was also a member; that two of these three were members of the same church to which the deceased belonged, and of which he was an officer, attended the same Bible class that the deceased attended, anc[ contributed to the fund mentioned above; that two of those who were members of the Klan attended the funeral of the deceased; and that at leant one of them attended it in the regalia of that organization. It further appears that the fund to which some of the jurors mentioned above had contributed was one to which the public generally were asked by a local newspaper to contribute for the relief of the widow and children of the deceased; that those of the jurors who made contributions to the fund made them for the support of the widow and children of the deceased, though they attached no conditions to the donations; that counsel was employed to assist the state in the prosecution, though it does not appear that he was paid, or was to be paid, out of that fund, in whole or in part. It also appears that the jurors, who were Klansmen, answered on their voir dire that the fact that they were members of the Klan would not influence their verdict one way or another if they were accepted as jurors; that those who were members of the same church and Bible class, as was the deceased, answered that they would not be influenced by that fact in reaching a verdict; and those who made donations answered similarly.
 

 Because a juror tendered an accused on trial for murder is a member of the Ku Klux Klan, of which the deceased was also a member, or of that organization and of the
 
 *547
 
 same church'and Bible class of which the deceased was a member, and' of which church he was an officer, does not render the juror incompetent,- when it appears that, notwithstanding these affiliations, the juror has not become biased or prejudiced in the case, and is in position to decide it fairly and impartially. As relates to the Klan, it appears from the answers of one of the jurors that there is nothing in the rules, regulations, or ritual of that organization that would call upon a Klansman to convict a person charged with killing a member of the organization when the law and th§ evidence does not justify a conviction. As relates to the other organizations mentioned, it is obvious that there is nothing in them that would call for or sanction a verdict not warranted by the law. Hence, unless it appears that these affiliations caused the jurors mentioned to become biased or prejudiced against the defendants, there is no reason why it should be held that the trial judge; because of them, erred in refusing to sustain the challenges. Our review of the evidence fails to disclose that these affiliations had any such effect, and creates the impression that they did not. Nor do we think that the fact that a juror, tendered to an accused on trial for murder, has contributed to a fund, raised by public subscription, for the relief of the widow and children of the deceased, is a ground, of itself or in connection with the facts above stated, to challenge the juror for cause. If the juror had contributed to a fund for the prosecution of the accused, or of the case, his haring done
 
 so
 
 would bé a ground for challenge, and the reason why it would be is because the making of the contribution of itself would show bias, and to force the juror upon the accused would be to force upon him a juror who was aiding, or had aided, in the prosecution of the ease. State v. Moore, 48 La. Ann. 380, 19 So. 285. However, a contribution for the relief of the widow and children of the deceased is obviously made upon the supposition that the widow and children are in necessitous circumstances, and the contribution cannot be reasonably considered as made for the prosecution of' the case, although, when made, no conditions were attached to it. Such a contribution does not show bias in the case. It' is true that, as argued by defendants, one of the jurors tendered said on his voir dire that he had heard that the widow had employed counsel to assist the state, from which it is argued that the juror knew that counsel’ had been employed when he made the contribution, and hence is presumed to have madé it with the end in view of assisting the widow in prosecuting the case. It is sufficient, however, to say that the record does not disclose that the juror heard before the contribution was made that the widow had employed counsel, and we infer from the trend of the examination that the juror heard that the widow had done so after the contribution had been made. Nor does the fact that at least one of the jurors tendered the defendants went to the funeral of the deceased, and did so in the regalia of the organization to which the deceased belonged, render the juror incompetent, whether considered alone or in connection with the remaining facts stated above.
 

 Viewing the facts before us as a whole, and considering that each juror stated, in substance, that he felt in position to render a fair and impartial verdict, we are not in position to say that the trial judge erred in refusing to sustain the challenges for cause. Hence, defendants have no just caus.e to complain because they exhausted five of their peremptory challenges in challenging these jurors.
 

 It may be said as a matter of justice to the counsel employed, though we have, for obvious reasons, not considered the statement in reaching a conclusion as to the validity of these challenges, that counsel stated in open
 
 *549
 
 Court, though not as a witness, that he was not receiving one penny, directly or indirectly, out of the fund above mentioned.
 

 Bills 6 and 8.
 

 These bills were reserved by defendants to two rulings of the court, in .each of which the court sustained a challenge of a juror for cause, made by the state, because the juror in each instance Said on his voir dire that he would not inflict the death penalty in a case where the evidence was purely circumstantial. The defendants objected to the challenge for cause on the ground that the state had not declared that the case was one wherein the evidence was purely circumstantial, and until it so declared it had no right to challenge for cause on that ground. During the course of the trial it developed that the state’s ease consisted purely of circumstantial evidence. But, aside from that, even the erroneous sustaining of a challenge by the state for cause affords no ground for setting aside the verdict. State v. Huff, 118 La. 194, 42 So. 771; State v. Breaux, 104 La. 540, 29 So. 222; State v. Claire and Gibson, 41 La. Ann. 1067, 6 So. 806.
 

 Bill 10.
 

 This bill was reserved to the overruling of a challenge for cause, based on the ground that the juror’s wife was a third cousin of the widow of the deceased. When the challenge was overruled the juror was challenged peremptorily by defendants. There was no eiTor in overruling the challenge. The connection was only by affinity and was remote. The juror stated on his voir dire that he would not be influenced by the connection. The law vests the trial judge with discretion in determining the competency of jurors, when, because of relationship or other cause, their competency is questioned, and the discretion, so vested, will not be interfered with unless clearly abused. State v. Scarborough, 152 La. 669, 94 So. 204; Act 135. of 1898, § 1.
 

 Bill 11.
 

 It appeared on the examination of the juror Theodore Reiser that Reiser’s brother_and the deceased married sisters, and that the state, upon that ground, challenged the juror for cause, which challenge was sustained by the trial judge. It does not appear that there was error in sustaining the challenge. Still, if there were, as we held .in passing on bills 6 and 8, the defendants have no legal ground to complain, for the right oían accused in the impaneling of a jury is not to select jurors, but is only to reject them. State v. Carricut, 157 La. 140, 102 So. 98. We may here say that the trial judge showed no inconsistency, as complained of by defendants in their brief, by overruling the challenge for cause shown in bill 10, and by sustaining the challenge in this instance, as a comparison of the two grounds of challenge will show.
 

 Bill 9.
 

 The name of G. C. Kelly was placed in the detalibus jury box twice by the jury commission, once as G. C. Kelly, and once as Grover Kelly. Both names were drawn out of the box, and, as it appeared that Grover Kelly and G. C. Kelly were one and the same person, defendants moved to quash the list of tales- jurors in the detalibus jury box, because, when the box was filled by the jury commission, it did not contain the names of 300 men,, but only 99. There is no suggestion that Kelly’s name was put in the box twice with any fraudulent intent.
 

 Act 113 of 1918 contemplates that the jury commission shall select, at such times as the court may order, 100 tales jurors and put their names in a box, to be known as the tales jury box, and that the commission may supplement, at any time, without an order of court, the names of tales jurors in said box, until the full complement of 100 is reached. The act, however, does not contemplate that if the jury commission, in carrying out the
 
 *551
 
 order of court or in supplementing, without such order, the names in said box up to the full complement of 100, should select, through error or inadvertence, the same person twice, under different names, or, for that matter, under the same name, the result must be the quashing of the box. Defendants, however, contend that such must be the result, and, in support of their contention, they cite State v. Love, 106 La. 658, 81 So. 289. In that case a motion was made to quash the regular venire, upon the ground that the jury box from which the venire had been drawn did not, at the time of the drawing, contain 300 names, as required by law. The court found that the box contained only 220 names instead of 300, when the venire was drawn. The' court, in passing on the motion, said:
 

 “The drawing of the jury in question from only 220 names in the box is one of those irregularities so gross, so at variance with the strict mandate of the law that it amounts to a wrong per se on those affected by it, and is an injury so apparent, and to those who, like the accused, have reason to complain of it, so great, that they need, in the way of showing injury, do nothing more than allege injury.”
 

 Defendants contend that, by analogy, the foregoing ruling is applicable to the issue raised by them. However, in our opinion, it is not. That case, that is, the Love Case, has no pertinency here. The question, here presented, arose, however, in the case of State v. Batson, 108 La. 479, 32 So. 478, when the same, act was under consideration (Act 135 of 1898) that was under consideration in the Love Case. In the Batson Case it was held that the accidental duplication of one name in the venire box, although it had the effect of reducing the names therein below the number-fixed by law, did not justify the quashing of the venire. The decision is pertinent here. We may add that the Legislature intended that the jury laws, like other laws, should be practical, and that they should be interpreted with that end in view. State v. Ballerio, 11 La. Ann. 81; State v. Desselles, 150 La. 494, 90 So. 773. To sustain defendants’ contention would be to so interpret the law as to make it impracticable. The motion to quash was properly overruled. Defendants could have suffered no injury from the error complained of.
 

 Bill 18.
 

 This bill was taken to the overruling of a motion to quash an ari-ay of 75 detalibus jurors drawn and ordered to appear in this case, to set aside and annul the selection of the names remaining in the detalibus jury box, and to have the court order the jury commission to reassemble and replenish the box by selecting names from the entire parish instead of from one ward thereof. The motion is based on the following grounds: That the names placed in the box from which the 75 tales jurors were drawn were selected by the jury commission from ward 3 of the parish, in which the city of Lake Charles is situated; that while the crime with which defendants stand charged was committed in ward 7 of the parish, yet that they, defendants, were made to stand the brunt , of an election held in the city of Lake Charles while the charge against them was pending; that said crime was one of the principal issues in said election, and that, unless they should be granted the relief for which they ask,, they will suffer irreparable injury.
 

 In explanation of the foregoing motion, it may be here said that Duhon, for the murder of whom defendants were convicted, was a deputy sheriff, and, when killed, was accompanied by W. E. Collins, a United States Deputy Marshal, who was also killed. These officers were said to have lost their lives while discharging their duties in the execution of the prohibition laws. Defendants were charged with both murders, and the evidence against them was purely circumstantial. Duhon was a resident of the city of Lake Charles.
 

 
 *553
 
 It is not contended that the members of the jury commission were guilty of any fraud in filling the detalibus jury box or in supplementing the names therein to the full complement of 100. In fact, defendants virtually disclaim that there was fraud, and. moreover, it appears that approximately 75 per cent, of the names in the box were placed there by the commission before Duhon and Collins were hilled.
 

 Evidence was adduced on the trial of the motion. This evidence shows that all of the names in the box, when the 75 detalibus jurors mentioned in the motion were drawn and ordered summoned, except two, resided in Lake Charles, and that those two resided in the .same parochial ward in which Lake Charles is located. The evidence also shows that 11 days after these homicides were committed a primary election was' held in the city Of Lake Charles for the nomination of a municipal officer. A number of witnesses were examined on the trial of the motion. Some of them testified that the killing of Duhon, or the Dunn Case, as it is sometimes referred to in the evidence, was injected into the campaign by some of the supporters of one of the candidates, and speak of the case or homicide as having been an issue in the election. One or two of the witnesses testified that, as a result of the injection of the homicide into the campaign, it was estimated that one of the candidates lost about 200 votes ’ which he otherwise would have received. Those who testified, as stated above, gave it as their opinion that, under these circumstances, as the election had been recently held, it would endanger the fairness of the trial if the jury were selected largely or entirely from Lake Charles. None of these witnesses, however, testified • it was an issue in the campaign that, if one candidate should be elected it would mean the conviction of defendants, and, if the other were elected, it would mean their acquittal. These witnesses disclaim having heard anything to that effect. We gather from their evidence, as a whole, that what they heard discussed in the campaign was the supremacy of law and order, and which of the candidates stood for the more rigid enforcement of the law, and that, in this connection, the killing of Duhon and Collins was mentioned. On the other hand, witnesses of equal prominence in business circles, or of equal prominence politically, as those mentioned above, testified that they did not hear the killing of Duhon and Collins discussed as an issue in the campaign, though it appears from the record that, if the homicide had been very generally discussed as an issue, they would have heard of it. These witnesses gave it as their opinion that a fair and impartial trial of this case could he had before a jury selected largely or entirely from Lake Charles.
 

 We conclude from the evidence that, while the killing of Duhon and Collins was injected, to some extent, ’ into the campaign by some of the supporters of one of the candidates, yet that the killing was not generally discussed as an issue in the campaign, and that the guilt or innocence of defendants was not a part of that issue. What really occurred, we take it, was that some of the supporters of one of the candidates, thinking that their candidate was likely to more rigidly enforce the laws than the other, raised the issue of law enforcement, and referred to the killing of Duhon and Collins as an illustration of the necessity for strict law enforcement.
 

 The trial judge in a motion of this kind ‘ is vested, as he is in a motion for a change of venue, with discretion as to whether the motion should be granted, and, unless an abuse of that discretion is clearly shown this court should not interfere with his ruling. See Marr’s Criminal Jurisprudence (2d Ed.) § 384, p. 579. State v. Morgan, 142 La. 755, 77 So. 588. It does not follow that, be
 
 *555
 
 cause those homicides were referred to in the campaign, it was likely that the minds of the people had become so fixed as to the guilt or innocence of defendants as t<? have made it unlikely that defendants could get a fair and impartial trial before jurors selected from Labe Charles, or so fixed as to have endangered the fairness of the trial. The trial judge “thought that defendants could get a fair and impartial trial by jurors drawn from that locality. We are not prepared to say, that he erred. We may add that the selection by the jury commission of all the detalibus jurors from one ward, in which a city is situated, is not, in the absence of fraud or evidence of the commission of a great wrong, fatal. State v. Evans, 137 La. 379, 68 So. 732. In this instance we find neither fraud nor the commission of a great wrong.
 

 Bills 12, 13, 14, 15, and 16.’
 

 These bills were taken to rulings of the court on the admissibility of evidence offered on the trial of .the motion to quash the array of the 75 tales jurors, and to annul the selection of the names of those remaining in the detalibus jury box, mentioned in the bill just considered. We have deferred discussing these bills, for convenience sake, until after considering the motion to quash. The first of this series, that is bill 12, was reserved to the overruling of an objection to a question-propounded to a witness to ascertain whether in his opinion a jury of 12 men could be selected who would be able to render a fair and impartial verdict. The question was objected to by defendants as not stating the proper test, and the objection was overruled. The state then immediately amended the question by adding the following: “From ward 3 of the parish of Calcasieu or the city of Lake Charles.” The question was proper under the issue' raised by the motion, and the ruling was therefore correct. Bill 13 was taken to the overruling of an objection to a question propounded to a witness to ascertain if he ever heard any one state or intimate that, if a certain candidate were elected, defendants would be acquitted. The evidence here sought to be elicited was admissible in rebuttal of defendants’ contention that the case against them was injected into the campaign. The question ruled out, forming the basis of bill 14, consists of really two questions. This question, taken as a whole, is unintelligible, and hence was impossible to answer. The ruling eliminating the question was correct. Bill 15 was taken to the sustaining of an objection to a question asked a witness, connected with a local newspaper, the purpose of the question being to show what amount was subscribed to the Duhon fund, that is, to the fund raised for the relief of the widow of the deceased and her children. The court sustained an objection to the question on the ground that the evidence sought to be elicited by it was irrelevant. The question at issue was whether the case against defendants had been injected into the campaign, and, if so, whether a fair and impartial trial could be had by defendants before a jury composed largely of detalibus jurors selected wholly from ward 3 of the parish, which includes Lake Charles, and selected almost entirely from that city. The evidence sought to be elicited was irrelevant to that issue. It had no tendency to prove that the case against defendants was injected into the campaign, or to show the result flowing from the injection of the case therein. Bill 16 was reserved to the sustaining of an objection to a question, propounded to a witness, for the purpose of showing that, in the opinion of the witness, it was a fact that there had been a great deal of expression by those ordinarily summoned for jury duty as to the guilt or innocence of defendants. The evidence sought to be elicited was objected to by the state because of irrelevancy. The ruling of the court sustain
 
 *557
 
 ing the objection was correct. The opinion of the witness as to the existence of that fact, if it were a fact, had no legitimate probative value, and may be said to have been irrelevant. Bill 17 was taken to the overruling of an objection to a question propounded by the state to a witness to show whether the witness had. heard any one say that, if a certain candidate for the office of mayor should be elected, his election would result in an acquittal or a conviction of defendants. The question was objected to by defendants on the ground of irrelevancy. The trial judge overruled the objection. The ruling was correct. The evidence was admissible as tending to show that the casé against defendants was not an issue in the election, and hence to rebut the contention of defendants that it was.
 

 Bill 4.
 

 This bill was reserved to the overruling of an objection to the following question propounded by the state to J. Horace Lyons, the sheriff of Calcasieu parish, to wit:
 

 “Please tell the jury, Sheriff, what he stated to you regarding what he was going to do, where he was going, and what he was going to do.” .
 

 The defendants objected to the question on the ground that its purpose was to establish a conversation held by two officers out of the presence of defendants, and that it is improper and inadmissible to establish such a conversation. Immediately preceding the asking of the question, the state established by the witness that Duhon, the deceased, yvas a deputy sheriff on March 6. 1925, the day that Duhon is said to have been killed. The trial judge, in his statement attached to the bill, says:
 

 “The theory of the state is that the homicide occurred at the home of the defendants about 30 miles from the courthouse and 2 or 3 miles from the town of Yinton, and that the deceased had gone there with a warrant to search the premises under the Hood Act. One theory of the defense is that the homicide did not occur at the home of the defendants. It was competent, as a circumstance in-the case, to show that the deceased had been instructed by his superior officer to go to the place at the time, and that he started in that direction, with the .intention of obeying the order. The home of the defendants could not be established as the place of the homicide except by circumstantial evidence, for the reason that the house was destroyed by fire on the night of the homicide, and the body of the officer was found in his automobile several miles distant.”
 

 The state was here attempting to show that the deceased was instructed by his superior officer to go to the home of defendants and search it, under a search warrant, and that the deceased said shortly before the homicide that he was going there for that purpose, and the question seeks to elicit nothing more.
 

 In Wharton on Criminal Evidence, vol. 1 (10th Ed.) § 237A, p. 467, it is said that the “ex parte declarations of a deceased person as to his physical or mental condition, purpose and intent are called ‘natural evidence,’ and are admissible as original evidence.” In State v. Morgan, 142 La. 755, 77 So. 588, it was held that a conversation had with the victim of the homicide, out of the presence of the defendant, in which it appeared that the victim said, 3% hours before he was killed, that he would arrest the defendant that night, was not objectionable as hearsay, but was admissible as tending to show that the deceased was looking for defendant, intending to arrest him, the court being of the opinion that the fact that the deceased was looking for the defendant, if such was the case, was a circumstance tending to connect the defendant with the homicide. That case, however, was reversed and remanded on rehearing, though on an entirely different point. The same case came before this court again, and the ruling as to the admissibility of the conversation considered on the preceding hearing was adhered to, and- the court, in addition, passed on the admissibility of another
 
 *559
 
 conversation, one had with the deceased and a witness named Tedlie, which the court said was of the same purport as the first conversation, which was one had with a witness named Jennings, and held that the second conversation was admissible as well as the first. A rehearing was granted in the case, and on the rehearing the only reference that was made to the first conversation, the one with Jennings, was that, when the case was before the court on an appeal from a former conviction, it was held that that conversation was admissible. The court then took up for consideration the second conversation, the one had between the deceased and Ted-lie, and pointed out that it contained many statements that were inadmissible and prejudicial to the defendant in the ease, and held that the conversation should not have been received in evidence. Defendants point to this case as rejecting the principle upon which the ruling rests in the same case, as reported in the 142 La., and as, in effect, overruling that case. We do not so conclude. But, even if it did, still, in a later case, this court held that a statement of the deceased, made immediately before the homicide and out of the presence of the defendant, showing that it was his purpose to return to a certain building, where he was killed, to collect a debt, was admissible to show why he returned, and cited, in support of the ruling, the excerpt from Wharton, quoted above. State v. Vial, 153 La. 883, 96 So. 796. In our view, in -the case at bar, the evidence that the state sought to elicit by the question, and which it did elicit, was admissible to show the intention and purpose of the deceased, that is, that he intended to go to the home of defendants for the purpose of executing a warrant, and was not objectionable as hearsay, or upon any other ground.
 

 Bill 19.
 

 Defendants, during the trial, attempted to show that Duhon was killed by Josh Griffith and his associates and not by them. Griffith and his associates lived at a place called Little Jaurez, not very far distant from the home of defendants. Defendants showed by the sheriff of Calcasieu parish that the deceased and Collins had made, at some time prior to the homicide charged in this case, a raid on' Little Jaurez, in which Josh Griffith and another were arrested. Defendants also showed by the sheriff that an account of this raid was commented on by a local newspaper and by the district attorney, and that the sheriff had read the article. The defendants then asked the sheriff whether Griffith was referred to in that article.as the “king of outlaws.” The state objected to the question on the ground of irrelevancy, and the court.sustained the objection. The evidence was clearly^ irrelevant, for whether or not the article referred to Griffith as the king of outlaws had ho tendency to show that he killed the deceased. Moreover, the evidence was hearsay.
 

 In the sa.me bill it appears that defendants asked the sheriff' the following question : “Those two men were arrested; were there bills filed against them?” This question was objected to by the state as being irrelevant, and the objection was sustained. Defendants, in their brief, seem to be under the impression that the question included both the arrest and the filing of bills. This is error. The arrest had already been shewn by the same witness, and the reference to it in the question propounded is a mere assertion of the fact that it had been made. The-arrest having been established, we are not prepared to hold that there was reversible error in ruling out the evidence as to the filing of bills of information. This' is so, because the only purpose of the evidence was to show motive; and, under these circumstances, the motive was the same and existed to the same extent whether bills had been filed or not.
 

 
 *561
 
 Bill 20.
 

 This bill shows that the sheriff, Mr. Lyons, while a witness on the stand, was asked the following question: “Mr. Lyons, you know as a matter (of fact) that that so-called outlaw will never be tried now?” The evidence which the defendant sought to elicit here was ruled out on the ground of irrelevancy. It was irrelevant whether Mr. Lyons knew whether Griffith would ever be tried after the deceased and Collins, who were witnesses against him, had been killed. Moreover, as stated substantially by the trial judge, in his per curiam, the witness could not have known that Griffith would never be tried, for, as a matter of fact, at the time this bill was signed, Griffith’s codefendant had been tried and convicted, and Griffith’s case continued on account of his illness.
 

 Bill 21.
 

 The defendants asked the sheriff, while he was on the witness stand, whether Griffith went to the courthouse at Lake Charles immediately prior to the killing and made an effort to get the district attorney out of his office, but that the district attorney refused to come out. The court ruled the question out, and defendants reserved a bill. This question was asked in order to show the feeling of Griffith and his associates towards the officers. However, immediately after the court ruled the question out, defendants asked the witness the following question: “Can you answer that question?” The answer was, “I only heard it from hearsay.” The court then said, “Answer from what you know”; and the witness replied, “I don’t know it to be a fact.” It therefore appears that, if the ruling of the court be erroneous, still defendants have suffered no injury, for the witness knew the fact only from hearsay, and hearsay was inadmissible to establish that fact. In the same bill it appears that, referring to the sheriff’s knowledge of the supposed visit of Griffith to the district attorney’s office, defendants asked the sheriff the following question: “I will now ask, Mr. Lyons, if you got that from your deputies, the same as you got these other matters from Mr. Duhon.” The question was ruled out, and properly so, for, what the sheriff heard being inadmissible as hearsay, it was irrelevant to inquire from whom he heard it.
 

 Bills 22 and 25.
 

 The first of these bills shows that defendants asked H.
 
 K.
 
 Bodreguez, a witness for the state, while on cross-examination, the following question:
 

 “Didn’t you first tell a story, and Mr. Peveto and Mr. Lyons wouldn’t stay with you on it, and then you changed it — your first story?”
 

 This question was objected to by the state, and the objection was sustained, the court saying at the time:
 

 “The question in that form is not proper; you may lay a foundation for impeachment.”
 

 The defendants then asked Bodreguez the following question:
 

 “Now, Mr. Bodreguez, did you not state and cause to be published ih the Lake Charles Ameriean-Press, the statement that you got there (meaning the home of defendants) at 8:40?”
 

 The state objected to this question on the ground that it was not the- impeaching question, because neither the time was stated nor the party or parties to whom the statement was made. The objection was sustained.
 

 In the second of these bills it appears that while Lee Manuel, a witness for the state, was on cross-examination, he was asked the following question:
 

 “Mr. Manuel, you have told quite a few strange things about (what happened) over there (meaning the home of defendants) that day and that night, that evening, contrary to this statement, haven’t — ”
 

 The state here objected to this question, because it was not the impeaching question
 
 *563
 
 properly put, and the court sustained the objection. 1
 

 The defendants then asked the witness the following question:
 

 “Did you state that - during the afternoon of that day there were a good many strange people in there that evening?”
 

 The state objected to the question, “unless the time and place, and the people (to whom the statement was made) are given the vpitness.” The court ruled that it thought the witness was entitled to that information. The defendants then propounded to the witness the following question, to wit:
 

 “Did you state that during the afternoon of that day, say 4 o’clock, you heard a good many horns blowing there?”
 

 .This question was objected to by the state for the reason urged against the preceding question, and the objection was sustained.
 

 The foregoing questions were asked merely for the purpose of testing the credibility of the witnesses to whom they were propounded.
 

 The rule is “that where the ci;oss-examination is merely for the purpose of testing credibility, a question as to an inconsistent statement need not specify time, place, or persons present. * * * ” 40 Cyc. p. 2717. The question does not arise as to whether a proper foundation has been laid to show that a witness has made contradictory statements until an effort is made to contradict him by showing by another witness that he has made such statements, and if such effort be made, it is then that the impeaching question cannot be put unless the proper foundation has been laid. State v. Lemond, 141 La. 306, 74 So. 1004. See, also, State v. Simon, 131 La. 520, 59 So. 975; State v. Guy, 107 La. 573, 31 So. 1012; State v. Wiggins, 50 La. Ann. 330, 23 So. 334. The objections, therefore, in the present instances, were prematurely urged, and, strictly -speaking, should not have been sustained. But should we, for that- reason, set aside the verdict? The court by its rulings did not deny defendants the privilege of eliciting from the witness the facts which defendants sought to elicit. All that the court required was that the defendants state the time when and the place where the statements were made and the person or persons to whom they were made. Defendants might have complied with this requirement. Their failure to do so places them in the position of relying on a purely technical error for a reversal, which did not, in fact, injure them. Not only error, but injury, must be shown to justify a reversal based on a ruling excluding evidence tendered. Marr’s Criminal Jurisprudence (2d Ed.) p. 909, § 590; State v. Coll, 146 La. 597, on pages 606, 607, 83 So. 844. Our conclusion is that these bills do not show reversible error.
 

 Bill 23.
 

 In this bill it appears that, when the sheriff was on the stand, it was shown by him when he reached' the place where the bodies were found that Ernest Gilbert, a justice of the peace, and Bill Buxton were there. After defendants had ascertained from the witness Gilbert’s! first name, they asked the witness the following question: “He is not the same El-nest Gilbert, who was charged and tried here -?” This question was objected to on the ground of irrelevancy, and the objection was sustained. We judge from their brief that the question was asked by defendants for the purpose of showing that Gilbert committed the homicide here charged. The trial judge, in his per curiam, says:
 

 “The supposed relevancy of the question is based upon the theory of the defendants that the neighborhood of Starks, where the bodies in the car were found by Buxton and Gilbert, was infested with dangerous criminals who may have committed the murder. This theory had not developed at the time this: bill was reserved, and the judge did not therefore apprehend any relevancy in ■ the question. Later-in the trial Gilbert .himself testified/ and said that he had been tried and acquitted on a charge of murder.”
 

 
 *565
 
 If defendants have the right, in order to show that Gilbert, and not they, committed the homicide to prove that Gilbert was tried for some offense, still, they should have advised the court that such was the purpose of the question, under the facts, as stated by the judge. The question does not appear to be relevant on its face to the main issue or to anything in the proceedings had up to the time it was asked. Moreover, as Gilbert himself acknowledged, while a witness on the stand, later in the. proceedings, that he had been tried for murder, defendants would 'seem to have no cause to complain of the ruling.
 

 Bill 24.
 

 In this bill defendants assert that, when the judge sustained the objection shown in the preceding bill, they requested that the jury be withdrawn and that the evidence of the witness be taken in order to perfect that bill, but that the judge refused to grant the request. The judge in his per curiam says:
 

 “The trial judge did not refuse to have the jury withdrawn in order that the bill might be completed. He well understands that the defendants had such a right, if they wished to exercise it. In this instance there was a mere suggestion by defense counsel that they ought to have the jury withdrawn, whereupon the court asked, ‘Oh, why do you want to do that?’ and counsel proceeded without further comment.”
 

 It is well settled that the statement of the judge prevails over the statement of the defendants and of their counsel whenever a conflict arises between them. Defendants, however, point to the fact that in a transcript, consisting of the evidence that the state offered in this case, it appears that, on the occasion mentioned above, they requested the judge to withdraw the jury, that the judge refused to do so, and that they reserved a bill. If the note of evidence and the proceedings shown in that transcript had been officially taken, the entries there made would prevail over the statement of the judge, but that record is not official, for, although made by a deputy clerk, it was made by one employed by defendants, and was not made under orders of the court. See Act 113 of 1896. The statement of the judge must prevail therefore, and, as such is the case, there was nothing on which to base a bill, nor was one reserved at all.
 

 However, were we to examine the transcript referred to, for the purpose of ascertaining what was done, nothing would be found that would materially change the situation. All that that transcript shows with reference to the matter that is different from the statement made by the trial judge is that, after the judge had made his ruling excluding the question shown in the preceding bill, the propounding of which appears to have been interrupted by the interposing of the objection made by the state, the defendants, through their counsel, requested that the jury be withdrawn so, that they might complete the question, and that the court declined this request. Obviously, there was‘no reason to withdraw the jury to enable counsel to complete a question.
 

 Bills 26 and 27.
 

 These bills were taken to the ruling of the court excluding certain evidence which the defendants sought to' elicit from the state’s witness, Manuel. It appears from the evidence, incorporated in one of the bills, that, on the examination in chief, it was brought out that Manuel, at about 9:15 o’clock on the night of the homicide, returned to Bennie Corbello’s home, which was situated approximately from 350 to 400 yards from the home of defendants; that on reaching Corbello’s home, Manuel unsaddled his horse and mule; and that, immediately after having done so, heard three shots, which, judging from their sound, seemed to him as if they had been fired from the home of defendants; that, after hearing the shots Manuel went to the | house (Corbello’s), which was 90 feet from
 
 *567
 
 the barn; took off his hoots, washed his feet, and went to his room; all of which he testified took about 15 minutes. The witness, after some eyidence had been brought out, unnecessary to mention here, was tendered for cross-examination, and was thoroughly cross-examined as to what he did after reaching and leaving' the barn. On the cross-examination the witness said that after leaving the barn, he went to the house, unlaced and took off his hoots, which were 18 inches high, took off his clothes, washed his feet, said his prayers, looked at his watch, and went to bed.
 

 The foregoing evidence as to the firing of the shots was offered by the state to substantiate its theory that the homicide was committed-by defendants at their home between 9:15 and 10 o’clock on the night on which the shots were heard. There was evidence before the jury showing that Robert Dunn, one of the defendants, -left Vinton, which is about 2% miles from his home, apparently for the latter point, on horseback, at the hour of 9 o’clock on the night on which the shots were heard, and it was the theory of the defense, in part, that Robert Dunn was not at home when the shots were fired, and. hence was not guilty of the murder charged, even if it was committed at his home. Therefore it was to Robert Dunn’s interest .to show that, if the shots were fired, they were fired as near 9 o’clock as possible, for the nearer to 9 he could fix the firing of the shots the greater would be the probability that he was not at home when they were fired. ■ Therefore the witness Manuel was ■thoroughly cross-examined as to what he had done between the time that he said he heard the shots fired and the time he got in bed in order to show that more time had been consumed between those two periods than his evidence otherwise would indicate, and that the witness, in fact, returned to Corbello’s earlier, and that the shots were fired earlier, than he had estimated.
 

 In pursuance of the foregoing general object, and especially in view of the fact that the witness had said that before going to bed he said his prayers, the defendants propounded to him the following questions, which were objected to by the state successfully on the ground of irrelevancy, to wit:
 

 “Q. What church do you belong to?
 

 “Q. Do you say the same prayer every night,, or do you say a different one?”
 

 Por either of these questions to have any relevancy it ought to appear that the answer to it, if made, would have some tendency to show that more time had elapsed between the firing of the shots and the time Manuel looked at his watch than he had estimated. The only tendency that the answer to either of the questions could have, as to whether more time had elapsed than Manuel had estimated, would be its tendency as relates to the time Manuel consumed in saying his prayers.
 

 In our opinion the answer to the question could have had no tendency to show the time consumed in prayer. Had Manuel, for instance, answered that he was a Baptist or a Catholic, or a member of any other denomination, or of none, the answer would have no tendency to show whether, more time had been consumed between the firing of the shots and the looking at the watch on retiring than Manuel’s evidence otherwise would indicate, for -the answer to neither question would point out the particular prayer or prayers Manuel said, which, notwithstanding his religious affiliations, if any, might have been long or short, slowly or quickly said. But counsel argue, in behalf of Robert Dunn, that the questions have such a tendency, and say:
 

 “The question, ‘What church do you belong to?’ was relevant and pregnant with high importance to the interest oi the defendant, Robert Dunn. The court will bear in' mind that this killing took place on Priday, March 6th; that that was during the Lenten season; that it is customary for Catholics, Episcopalians, and some other denominations to hold special services and to hold special prayer during the Lenten season, and especially on Priday eve
 
 *569
 
 ning; for instance in all good Catholic families on Friday evenings during Lent the Stations of the Cross are recited which require from 25 to 40 minutes. Suppose he is a Catholic, and upon this Friday evening had recited the Stations of the Cross, or had said his Rosary, is it not clear to any one that he could not have done this one act alone in less than from 15 to 30 minutes?”
 

 To make this argument pertinent, judicial cognizance would have to be taken, which cannot be done, that all good Catholics recite the Stations of the Cross on Friday evenings in Lent, and that Manuel, had he answered that he was a Catholic, was a good and consistent one, and judicial cognizance would also have to be taken, had he answered that he was a member of some other denomination, of the prayers used by such denomination, and as to whether he was a good and consistent member of such denomination, which cannot be done. Moreover, even if notice were so taken, still it is doubtful whether the evidence would have a tendency to show that Manuel said the prayers mentioned on retiring, or that he then said any other particular prayers.
 

 Counsel also argue that the second question is relevant, because, “If he (Manuel) had belonged to any one of several particular denominations, his prayer during Lent would, in all probability, have been different from the ordinary prayer.” However, what we have said about the foregoing questions applies also to this argument. In our opinion this bill does not show error.
 

 Bill 28.
 

 Ras Vincent was on the witness stand, and had testified, on the examination in' chief, relative to a cocklebur. On cross-examination he testified that on Saturday morning, presumably on the day following the homicide, defendants were arrested and kept in their cells. The defendants then asked him the following questions:
 

 “Q. Were any of their (defendants’) relatives or friends or counsel permitted to go in that jail for one week after they were put in there? A. I couldn’t answer that,question as well as Mr. Lyons could.
 

 “Q. Refresh your memory; is it not a fact that no relative, no friend, no attorney, was permitted to see them until the day’ that Mr. Burge was released?”
 

 The state objected to the last question on the ground of irrelevancy, and immediately, made the following admission:
 

 “That the state does not charge and admits to the jury that it does not charge that any member of the defense or their counsel disposed of the cocklebur.”
 

 The court sustained the objection, especially because of the admission made by the state, and the judge, in his per curiam, says:
 

 “The witness was testifying about a cockle-bur he said he found on the clothing of the body of the deceased, but which had disappeared and was never found. The object of the cross-examination was apparently to exclude the possibility that defendants or their friends could have disposed of this small bit of evidence. The state announced that no such charge was entertained by the prosecution, thus accomplishing the only purpose of this testimony. * * * ”
 

 It is true, as observed in effect by defendants, that any one charged with crime and confined in jail has a right to see and' employ counsel. However, if a sheriff should prevent one, accused of crime and confined in jail, from seeing counsel, whether to employ or consult them, his having done so, under certain circumstances, might, and doubtless would, entitle the accused to a continuance with respect to his trial on the charge on which he was arrested, but the fact that the sheriff had so interfered with the rights of the accused is not admissible on the trial of the accused for the crime charged against him, unless for some reason it becomes relevant to some fact at issue; nor is the fact that the sheriff prevented the accused from seeing his friends and relatives admissible on the trial, unless for some special reason it becomes relevant. The only relevancy that the evidence which the defendants sought to in
 
 *571
 
 troduce in' this ease could have had was to show that defendants had no connection with the loss.of the coeklebur. The state having admitted that neither defendants nor their counsel disposed of the bur, and that the state was not charging that they did, it became'unnecessary for the defendants to offer any evidence on the question, including the evidence they sought to offer here. In fact that admission, made by the state, shows that all that the state was trying to do was to account for a piece of evidence that was lost. The bill, in our opinion, is not well founded. ■ ■
 

 Bill 29.
 

 John Bergstedt was on the stand as a witness for the state, and had testified that he had a conversation with Byron Dunn, one of the defendants, less than three months before the homicide. The state then asked the witness the following questions, to which he gave the following answers:
 

 “Q. Just tell the jury what he told you on that day.
 

 “A. I said, ‘Byron, you have got turned aloose from this charge of bootlegging whisky.’ He said yes, but he said if these G- d-■ s-s of b-s ever bother me again there will be something doing.
 

 ■“Q. Who was he referring to?
 

 “(Defendants object unless you know.)
 

 “Q. Did he tell you?
 

 “A. No.
 

 “District Attorney: “Q. Who was it that made the statement to you?
 

 “A. Byron Dunn.
 

 . “Q. Is that he sitting there?
 

 “A. Xes, sir.”
 

 Defendants then asked the court to instruct the jury to disregard the testimony of this witness, for the reason that it had not been shown that any statement that might have been made by the accused was directed against either of the deceased, or had any reference to them. The court sustained this motion to the following extent, giving the jury at the same time these instructions:
 

 “The jury will disregard this evidence unless by other evidence in this case, or by circumstances sufficient in the minds of the jury to connect it, the jury finds by that evidence that there is sufficient reason to construe this remark as a threat against the deceased, under all the circumstances of the case. If the jury finds that there is no evidence in the case and no circumstances warranting the jury to conclude that this evidence constituted a threat generally against law enforcement officers, or such a threat as the jury can apply to the deceased in this case, then the jury, of course, will disregard the testimony of this witness as to the conversation with the defendant Byron Dunn.”
 

 Defendants excepted to the refusal of the judge to give the instructions requested.
 

 The evidence of the witness, in so far as it is of any importance, consists of the remark made by him to Byron Dunn and of Dunn’s statement in reply. The motion made by defendants that instructions be given the jury to disregard the evidence of the witness, though it includes all of the witness’ evidence, is directed, in reality, against that remark and that statement.
 

 With the foregoing explanation made, it may be said that threats made by an accused against a class of which the deceased was a member are admissible against the accused. 30 C. J. 190, § 417, verbo “Homicide.” The statement made by the defendant Byron Dunn, in this instance, was obviously a threat, and is strongly suggestive, on its face, of being one against any law enforcement officer who might trouble him. When the threat was introduced, it was in evidence that the deceased was a deputy sheriff, and had left Lake Charles to go to Byron Dunn’s home to search it for evidence of the violation of the Prohibition Law. Therefore the deceased was a law enforcement officer, who was in the performance of an act which might have resulted in giving Byron Dunn trouble. Under these circumstances the evidence was admissible. As it was admissible, there was no reason why the court should have instructed the jury, without qualification, as requested, to disregard
 
 *573
 
 it, and the greater is the r.eason why the in-1 struction requested should not have been given when it is considered that no objection was made to the admissibility of the evidence at the time it was offered and received. In our view, the defense has no cause to complain of the instruction as given hy the court.
 

 BUI 30.
 

 In this bill it appear that the defendants, in support of their theory that some third person or persons committed the murder charged in this case, and that they did not commit it, ashed J. C. McPherson, a witness for the state, on cross-examination, various questions. Defendants established by this witness that he had seen, at midnight, on the night the murder was committed, a strange man in the railroad station at Vinton, Vinton being a town a few miles from where the body of the deceased was found; that this man left on the south-bound train the next morning at 5:37; that when the witness saw the man he was acting strangely and appeared as if he were trying to conceal himself; and that the witness had discussed the incident with various people, in a general way, after having heard of the killing of Duhon. The defendants then asked the witness the following question, to wit:
 

 “Q. Now, in your general inquiry up there, have you found anybody in that country who gave you any information as to the identity of such a man being in that community?”
 

 This question was objected to'as being irrelevant, and the objection was sustained. The court ruled correctly, for it was not relevant to the issue whether the witness, in his general inquiry, had obtained any such information or not. Moreover, had the court permitted the question to be answered, the answer would have put before the jury the opinion of the witness, based upon the statements of third persons, made in conversations with the witness, and this would have been improper.
 

 Bills 31 and 32.
 

 These bills are not discussed in the briefs filed hy defendants. However, we have ex-, amined them, but find no merit in them.
 

 Bill 33.
 

 It appears from another bill found in the record that the frame of a sewing machine was found in the ruins of the home of defendants after the fire that occurred on the night of the homicide. It also appears from that bill that Dr. L. A. I-Iebert, a specialist in pathology and bacteriology, was called upon to examine the frame, or sewing machine, as it is referred to in the evidence, to ascertain whether there were traces of blood, •or the remains of blood, on the frame; that the witness scraped some of the material off a certain part of the frame, tested for blood, and found it, and that, by another test, the precipitin, he found that the blood, or remains thereof, was human blood. In the present bill it appears that Dr. Hebert was recalled by the state to the witness stand, and, after having been recalled, testified in chief as follows:
 

 “Q. Doctor, I will ask you if blood will burn so that you can’t recognize it in a test.
 

 “A. Just what do you mean?
 

 ‘•Q. Human blood like that on the sewing machine — would fire that was on the sewing machine destroy that blood?-
 

 “A. It will alter its physical appearance, but not its chemical appearance, chemical characteristics, rather.
 

 “Q. Have you recently and since you left made a test to see?”
 

 Here the defendants, through their counsel, interposed the following objection, to wit:
 

 “Objected to, unless the machine was put through the same process or a similar process to that which it went through.”
 

 This objection was overruled as going to the effect, and defendants reserved a bill. The examination of the witness then continued as follows:
 

 
 *575
 
 “Q. Just tell what you did, Doctor.
 

 “A. I first
 
 took some
 
 human
 
 blood
 
 and burned it on a red hot spatula, piece of steel, and then scraped this human blood I had taken from my own finger and found chemically it still tested blood. I then mixed also another portion of human blood, my own, with scraping from or varnish and paint from a comparatively new sewing machine, heated it in like manner, and found it still tested out human blood. Then I compared that with the scraping alone from the sewing machine without human blood, and found negative results.”
 

 The trial judge, in his per curiam attached to the bill, says:
 

 “The objection clearly goes to the effect. It was impossible to reproduce the conditions of the fire at the home of the Dunns, as demanded by counsel; but the expert did provide conditions which he testified worked similar results. Whether he was correct, and what effect the evidence should have, was a question for the jury, under careful instructions which were given them by the court that they should consider all facts and circumstances in determining what weight, if any, to accord'it. Brief instructions on the same point are included in the written charge.”
 

 From the foregoing it appears that the question presented to this court by the present bill to be answered is whether the trial judge erred in permitting the witness to testify, •over objection, to the tests made by him, and, as we have seen, the objection is that the tests were not made under the same conditions to which the sewing machine was subject during the fire.
 

 In 22 C. J. verbo “Evidence,” § 843, p. 755, in treating of the admissibility of experiments, it is said;
 

 “In accordance with the fundamental principle that the object of all evidence is the ascertainment of the truth with reference to the •existence or nonexistence of the facts in controversy, the criterion for the admissibility of evidence of experiments is whether such evidence tends to enlighten the jury and enable them more intelligently to consider the issues presented. Where the experiment is inconclusive, or raises a number of collateral issues, or the evidence seems to the court not to promise results justifying the use of time required to hear it, a party cannot insist upon producing it.”
 

 Ordinarily the conditions under which the experiment is made must be similar to the conditions that existed when the result contended for occurred, or, at least, substantially similar to them. 22 C. J. verbo “Evidence,” § 850, p. 757; Chamberlayne, Modern Law of Evidence, vol. 4, § 3174, p. 4395; Seibert v. McManus & Long, 104 La. 404, 29 So. 108; State v. McKowen, 126 La. 1075, 53 So. 353; Canal-Commercial Trust & Savings Bank v. Employers’ Liability Assurance Corporation, 155 La. 720, 99 So. 542; Hawks v. Inhabitants of Charlemont, 110 Mass. 110; Commonwealth v. Piper, 120 Mass. 185; B. & O. R. R. v. Fouts, 88 Ohio St. 305, 104 N. E. 544, Ann. Cas. 1915A, 1256.
 

 In the case at bar, there were differences between the conditions to which the sewing machine, with blood on its top plate, was exposed, if there was blood there before the fire, as contended for by the state, and the conditions under which the tests were made to determine whether its presence could be detected after the machine had gone through the fire. Should we, because of these differences, hold that the trial court erred in admitting evidence of the experiments made? in the cases cited, supra, the underlying principle upon which the evidence of the experiment or of the occurrence, where the evidence offered was of natural occurrences, was rejected, was that, due to dissimilarity of conditions, the experiments or the Recurrences were not relevant to the fact in controversy, and the evidence, had it been admitted, would have tended therefore rather to confuse than enlighten the jury. However, in the case at bar, it is otherwise, in our opinion. Here, one of the facts that the jury had to determine was whether the blood that the witness testified he found on the machine was there prior to the fire. As the machine had been exposed to great heat, evidence which tended to show whether or not the presence of human blood, after having been exposed to such
 
 *577
 
 heat, can be detected by analysis, is relevant to the issue, and, if believed by the jury, must be of assistance to them in passing upon the fact in controversy. The evidence offered in this instance had such a tendency. Our conclusion, therefore, is that the court did not err in admitting it.
 

 Bills 34 and 36.
 

 In bill 34 it appears that the state offered in evidence a photographic enlargement of the palm print of Robert Dunn. The print had been colored and marked by W. R. Ellis, an expert on finger prints, who was on the stand when the offering was made. The defendants objected to the offering on the ground that the photograph had been tampered with. The objection was overruled. In bill 36 it appears that the witness Ellis, who had marked the photograph, mentioned above, used the marked photograph in testifying before the jury. Defendants objected to the use of the photograph by the witness for that purpose, because the photograph was not a print of the palm of either defendant, but was a marked exhibit prepared by the witness out of the presence of the jury. This objection was also overruled. The trial judge in his statement attached to one of these bills, and referred to in his statement attached to th'e other, says:
 

 “Reproductions of photographs of the palm print of Robert Dunn and of a palm print on the door of the automobile in which the body of the deceased was found were projected, side by side, on a screen in the presence of the jury. No markings or pin, points could be used on this screen, for the reason that the reproduction, being a mere shadowgraph, was not sufficiently stable, and that punetures in the screen would destroy the small dots and lines of the pictures. The witness therefore produced a photograph of the palm prints identical with the one from which the screen production was made, except that he had drawn, in red ink, lines circling the portions for comparison in the two prints. As he would indicate these points on the screen, he would point them out on the photograph where they were fixed and permanent, with the red lines surrounding them. The reasons for the use of the photograph in this manner, and the fact that the ink lines had been drawn by the witness-for the purpose stated, were fully explained to the jury. The witness adopted and used the best possible means for presenting clearly to the jury his expert testimony and of showing exactly the data upon which his conclusions were based. I can think of no legitimate objection to the evidence.”
 

 In our opinion the per curiam of the trial judge disposes of these bills. The marked photograph was necessary to enable the witness to testify in such a manner that the jury could grasp clearly his evidence. As the photograph was connected with the evidence of the witness, it was not improper for the court to receive it in evidence. The fact that the photograph was marked by the witness, out of the presence of the jury, did not affect its admissibility. State v. Kuhl, 42 Nev. 185, 175 P. 190, 3 A. L. R. 1694. The witness, in testifying, called the jury’s attention to the fact that he had marked the photograph. We see no merit in these bills.
 

 Bill 35.
 

 While the witness Ellis was testifying as an expert on finger prints, he said:
 

 “I first wish to call your attention to this picture marked A 1, the enlargement of the print found on that door; B 1, an enlargement of the known palm print of W. R. Dunn. We first looked at these two pictures in a general way, and in order to determine whether or not these prints are the same, we must look at the manner in which those lines, of which I have spoken, lie in respect to each other. Now, we find here
 

 When the witness reached the point in his evidence indicated by the dash, the.defendants interposed an objection to the effect that the witness was lecturing, and asked that he be required to testify without lecturing. The objection was overruled.
 

 The trial judge in his statement attached to the bill says:
 

 “The witness was a highly intelligent and thoroughly trained expert. He was delivering
 
 *579
 
 Ms testimony in an orderly, clear, and respect-' ful manner, with no more ‘lecturing’ than was reasonably necessary, especially when it is remembered that he was compelled to stand before the shadowgraph on the screen and draw the attention of the jury to points of comparison by means of a pointer. The nature of the evidence required some explanation of these points. It would have been valueless to the nonexpert jurors without such explanation. The objections do not go to the substance of the testimony, but only to the manner of delivery, which was in every particular correct.”
 

 We find no error in the ruling.
 

 Bills 37 and 40.
 

 After Miss Zelma Longron, a witness for the defense, had testified that Robert Dunn, one of the defendants herein, stopped at her father’s home around 4 o’clock in the afternoon of the day on which the homicide is said to have been committed, and that he remained there for at least an hour, during which visit he made a business appointment to stop there again during the evening on his return .from Vinton, to which point he waS apparently going, the defendants asked the witness the following question;
 

 “Will you state. Miss Longron, what that business engagement was composed of; what was the nature of it?”
 

 The state objected to the question, and the defendants stated its object to be as follows:
 

 “The object of this question and this evidence is to show the nature of the appointment, in order for the jury to ascertain the length of time it would take in making the call later, as he returned from Vinton, whatever that engagement may have been with ,her father or mother.”
 

 The court sustained the objection, and defendants reserved a bill, which constitutes bill 37, and which will be considered after stating bill- 40. The bill last mentioned was reserved to a ruling of the court sustaining an objection to a question propounded to Sidney Longron, the father of the witness mentioned above, the. question being as follows, to wit:
 

 “Mr. Longron, in order to fix the time that Robert Dunn was at your home, I will ask you to state as near as you can everything that was said by Bob and everything that was said by you in that conversation.”
 

 The state, after announcing that it had no objection to the witness estimating, if he could, the length of time that Robert Dunn was at his place, objected to the question upon the ground that it was an attempt to introduce evidence which the court had already ruled was-inadmissible. As stated above, the court sustained this objection.
 

 The evidence which defendants attempted .to elicit from Miss Longron could have been of no value whatever to the jury in determining the length of
 
 time
 
 Robert Dunn was at the Longron home, for the simple reason that it could have had no tendency, had the introduction of the evidence been permitted, to, establish that fact. It would not even follow that, because Robert Dunn made the business engagement, he kept it, or, if he kept it, that the subject-matter of the appointment was more than mentioned and for some reason deferred, or that it was hurriedly or leisurely attepded to or discussed. In fact, the evidence could have had no value whatever to establish the point for which it was offered. Eor these reasons we find no error in the ruling of the court as relates to bill 37.
 

 With reference to the question propounded to Sidney Longron, and stated above, it should be observed at the outset that Longron was a witness for the defendants, and hence that the question propounded was one asked on the examination in chief, and not on cross-examination.
 

 It would be difficult to imagine a more indirect method of establishing the length of time that Robert Dunn was at the home of the witness than the method here pursued. Moreover, the method of establishing the length of time, adopted by defendants, was fraught with uncertainty. If the question
 
 *581
 
 had been permitted, and the witness had succeeded in repeating the conversation, or in stating, to use the phraseology of the question, as near as he could everything that was said, it might well have taken the witness a much longer or shorter time than was actually consumed in holding the conversation. Manifestly the proper question would have been one asking the witness, as suggested by the prosecution, in making the objection, to state or estimate the length of time Robert Dunn was at his home. Since no reason appears why defendants should have adopted so indirect and objectionable a method of examining the witness, our conclusion is that there is no error in the ruling of the court. See State v. Caron, 118 La. 349, 42 So. 960; 40 Cyc. p. 2406.
 

 Bills 3S and 39.
 

 The first of these bills is identical with bill 37, and hence, in our view, is not well founded. Bill 39 relates merely to the exclusion of hearsay evidence relative to Robert Dunn’s appointment to call at the Dongron home, and possesses no merit.
 

 Bill 41.
 

 During tlie trial of the case’ defendants moved that the jury be taken to the alleged scene of the homicide to view the location of defendants’ home, the roads leading thereto, the surroundings of the Dunn farm, and other points testified to by the witnesses for the state.. The motion was refused.
 

 The granting of a motion to take the jury to the scene of the homicide rests within the sound discretion of the trial judge. In- this instance there was no abuse of discretion. The scene was 30 miles distant from the courthouse. The difficulty, therefore, in taking a jury that far, and at the same time avoiding an occurrence which might give ground for a new trial, was great. Moreover, the trial judge says that there was no probability whatever that the visit would have been of any value to the jury in deciding the case. The scene had been fully described by means of oral testimony find the important points located by maps and measurements. We find no error in the ruling.
 

 Bills 42 and 43.
 

 Bill 42 is not discussed in the briefs filed by defendants, and possesses no merit. .Bill 43 was reserved to the overruling of an objection to a question propounded by the state to W. R. Ellis, an expert on finger prints. The question objected tó is as follows : •
 

 “Mr. Ellis, will you please state to the court and to the jury whether you would be willing and could take W. R. Dunn, the print of his right hand at the present moment, and compare it with the photographic copy that you took of this door and tell whether it was made-by one and the same hand?”
 

 This question was objected to as calling for the opinion of the witness and unnecessarily incumbering the record, and for the further reason that it was an attempt on the part of the state to influence the jury by making proposals which counsel for the state knew were-illegal. The objections were overruled.
 

 The trial judge says in his statement attached to the bill that:
 

 “The question went merely to the qualification of the expert, and not to the merits of the case. - It was intended,as a means of showing the confidence of the expert himself in the -accuracy of his science, which had been attacked on cross-examination. The test itself was not requested, and probably would not have been permitted, although a comparison of the finger prints of jurors to test the expert is approved by authority.”
 

 The question propounded is not to be commended. However, in this instance, we are not of the opinion that the answer to the question could have possibly worked harm to the defendant Robert Dunn or to his codefendant. , The witness had already testified, as appears from the per curiam to bill 34 and the evi
 
 *583
 
 dence shown in bill 35, with reference to a Known palm print of the hand of W. R. Dunn, and had compared it with a photographic copy of the palm print, taken from the door of the automobile in which the body of the deceased was found, and had given his answer as to the result. Under these circumstances we conclude that the use o’f the name of W. R. Dunn in the question propounded to the witness to test his ability and to show confidence in the accuracy of his science worked no injury, no effort having been made to carry the test suggested into execution. Hence our 'conclusion is that the bill affords no ground for relief.
 

 Bill 44.
 

 While W. E. Cutrer, a witness for the defense, and an expert on' finger prints, was on the stand, he was asked on cross-examination whether he could take the finger prints of the jurors, have them make other finger prints during his absence from the room, and thereafter identify the jurors by comparing the finger prints made during his absence with those taken by him. The witness answered that he could. The state then asked the witness to make the test. Th.e defendants then interposed an objection to the effect that the test proposed was not a proper one to show the qualifications of the witness, and that such course of action and examination by counsel for the state constituted misconduct, the test proposed being for the sole purpose of prejudicing the jury. The bill as presented to the judge for his signature recites that the objection was overruled. However, the judge in his statement attached to the bill says:
 

 “The proposed test was not permitted, although there is good reason as well as authority for permitting it.”
 

 This means that the objection was sustained. Defendants, in their original brief, concede that the test was not made, and complain merely that the request that the test be made was improper and prejudicial to the defendant. Therefore the objection to the making of the test will be treated as having been sustained, and the bill will be considered only from the standpoint of the alleged prejudicial effect on the jury arising from making the request.
 

 In Moon v. State, 22 Ariz. 418, 198 P. 288, 16 A. L. R. 362, quoting the syllabus, which correctly states the ruling of the court, it was held that:
 

 “It is not error, in a case in which finger print evidence has been used, to permit an ex-., .pert to pair finger prints of the jurors, properly taken and developed, for the purpose of illustrating the methods or the system of finger print identification and the truth of the claim that invisible finger prints can be developed and the identity of the maker revealed.”
 

 Prom the foregoing it appears, and we know of no decision to the contrary, that it would have been perfectly proper for the trial court to have permitted the making of the test. Hence it follows that it was neither misconduct nor error for the state to have asked that the test be made. We are not to be understood, however, as even intimating that it would have been reversible error, if the court had not possessed the discretion to grant the request, for ordinarily the mere asking of an improper question or the making of an unauthorized request by the state is no ground for reversal.
 

 Bill 45.
 

 The defendants placed on the witness stand a pathologist of prominence for the purpose of showing that blood could not be analyzed after having been taken from a piece of iron which was part of a sewing machine, the remainder of the machine having been totally consumed in the burning of a house which was full of furniture. After the qualifications of the witness, as an expert, had been shown, he testified that blood could not be analyzed, and its kind, whether human or
 
 *585
 
 animal, detected, after it had gone through such heat,, or even after it had undergone heat sufficient to “coddle an egg.” When the witness was tendered to the state for cross-examination, he was asked whether he was the same pathologist who was a witness before the grand jury in the Morehouse Case, known as the Daniels and Richards Case. The defendants objected to this question as being improper for the reason that it was irrelevant, not connected with, or incidental to, the examination in chief, and was asked for the sole purpose of prejudicing the jury against the witness and the defendants. The objection was overruled.
 

 The contention of defendants that the question was propounded for the purpose of prejudicing the jury against the witness and the defendants is based, in part, on the theory that any reference to the fact that the witness had testified in the Daniels and Richards Case, before the grand jury, in the parish of Morehouse, was sufficient to bias the jury against the witness, and thereby prejudice the defendants, for the reason that the jury in the case at bar was of Klan sentiment, and it had been openly charged and circulated throughout the state that the Klan was connected with the murder of Daniels and Richards, and hence that the question was asked for the purpose of influencing the jury against the witness.
 

 There is no evidence in the record showing that the jury was of Klan sentiment. The trial judge in his statement attached to the bill says that it was not established that the jury was of the sentiment, charged; that, in his opinion, the statement is incorrect; that with one exception Klansmen were challenged peremptorily by the defense until its challenges were exhausted, when one juror who said he was a Klansman was accepted; that, in so far as he, the judge, knew and believed, there were only two Klansmen on the jury; and that there was not the slightest evidence exhibited that the jury was of Klan sentiment. The judge, after making the foregoing statement, says, in reference to the question propounded to the witness, that:
 

 “The question was followed by others, indicating that counsel expected to show that the witness had made contradictory reports of his finding in the Morehouse Case (Daniels and Richards Case), or that he had improperly withheld his report. It was legitimate cross-examination as to his qualifications and reliability as an expert; but the witness fully protected himself, and the questions and answers were without any effect whatever.”
 

 The rule is well established in this jurisdiction that an accused has the right to cross-examine the state’s witness as to any fact tending to establish his defense whether the fact be connected with the examination in chief or not, while on the other hand the state has no right to cross-examine the witnesses of the accused on matters not connected with, or germane to, the examination in chief. State v. Swayze, 30 La. Ann. 1323; State v. Wright, 40 La. Ann. 589, 4 So. 486; State v. Coll, 146 La. 598, 83 So. 844. However, the rule limiting the cross-examination of the witnesses for the defense to matters connected with, or germane to, the examination in chief is not extended so as to include questions to test the credibility, of the witness, for such questions relate to a matter germane to the examination in chief, since the answers to them may affect the weight to be attached to the evidence of the witness. State v. Garner, 135 La. 746, 66 So. 181; State v. Johnson, 48 La. Ann. 437, 19 So. 476. In the case at bar, ■ the witness had given expert evidence on a material point. It was competent therefore for the state, on the cross-examination of the witness, to elicit any fact which would affect the weight to be attached to his evidence. Evidence that' the witness had made conflicting reports .or had improperly withheld his reports in a case in which he was used and sworn as an expert would have such tendency. Hence, the state
 
 *587
 
 had the right, acting in good faith,- to show, if it coiild, these facts on cross-examination. In order to show them, it was proper, if not necessary, to ask the witness if he was the same pathologist who testified before the grand jury in the case in which the state intended to show that the reports were made or withheld. Eor these reasons, at least, if the state was in good faith, we conclude that, in asking the question objected to, the state did not exceed the bounds of legitimate cross-examination. But the defendants contend that the state was not in good faith, and^cite authorities to show that, where on cross-examination the state asks questions for the ostensible purpose of obtaining answers affecting the credibility of the witness, though in reality for the purpose of getting the contents of the questions before the jury, and not the answers, the case will be reversed. We ought not, however, to lightly attribute bad faith to counsel in the conduct of a case, or in tlie cross-examination of witnesses, nor ought we to infer bad faith merely because the witness is prominent or because the cross-examination resulted in a failure. Óur conclusion is that the state acted in good faith, and that this bill does not disclose reversible error.
 

 Bill 46.
 

 This bill shows that the defendants offered, as evidence, a publication in a local newspaper giving an account of the raid, mentioned in another connection, on Little Jaurez. The state objected to the evidence chiefly upon the ground that, at best, it was merely a newspaper account and formed no part of the res gestae, and any statements made by the district attorney in the article had no bearing on the case. The objection was sustained. The evidence was clearly hearsay. .Moreover, we fail to see wherein any statements, attributed to the district attorney in the publication, could have any bearing on the case. . However, defendants argue that the publication furnished a motive for some of the residents' Of Little Jaurez, who they contend are guilty of the crime charged in this case, to commit the crime. It is sufficient, however, to say that it does not even appear that any of those referred to by defendants ever read or heard of the. article, and unless it so appears it cannot be said that the publication furnished a motive. But defendants also argue that a part of this article went to the jury without objection, and if for no other reason the entire article should have been received in .evidence. The bill shows that quotations from the article were read without objection on the part of the state. Because defendants read parts of the article before the jury without objection on the part of the state furnished no reason for them to introduce the entire article.
 

 Bills 47, 48, and 49.
 

 When Dr. Seaman was on the stand as a witness for the state in rebuttal, he was asked the following question by the district attorney:
 

 “I will ask you if Dr. C. W. Duval, the pathologist who testified in this case, would make the statement as a witness in this case, that blood which covered a certain given area on that part of a sewing machine, introduced in evidence, would be in a house which was destroyed by fire, and that the house was a frame building about 10x30, in which was some furniture, and he testified that the very fact that this machine was in that house would necessarily mean that all of the blood which was on that given space, no matter how thick the layer of it was, would be destroyed by the heat from that fire, would you say that he would be cor-' rect or incorrect?”
 

 When Mr. Clay was called to the stand in rebuttal by the state, the district attorney asked him a hypothetical question substantially similar to the one quoted above, except that the question stated, as a premise, that Dr. Duval said that in his opinion the heat of the building would be sufficient to destroy the blood to the extent that it would be impossible to determine its character, that is, whether it was human blood or not, by the
 
 *589
 
 precipitin test, and ended with the query, “Would you say that he was correct?”
 

 While Dr. Seaman was on the stand as a witness in rebuttal the state asked him the following question:
 

 “Please state how many drops of blood would have to have remained in the quantity of the material from which the test was made that would not be destroyed by heat for you to determine by the precipitin test that the matter you are examining is human blood, Doctor?”
 

 ■ The witness answered that less than an ordinary drop would be sufficient.
 

 Each of these questions was objected to for the reason that the evidence which the state sought thereby to elicit was not in rebuttal, but was evidence in chief.
 

 We have not before us the hypothetical questions propounded to Dr. Duval. However, the court in its per curiam to the bill showing the first question quoted above says that “the question was put to Dr. Duval, defense witness, as to the effect of heat on blood on a sewing machine, placed as the machine was said to have been placed in the burning house, in this ease, and that the question asked Dr. Seaman imposed substantially, if not exactly, the same conditions.” Moreover, we know from another bill that Dr. Duval testified 'that blood could not be analyzed, or detected as to its kind, after it had undergone the heat of a burning house, filled with furniture, the blood at the time being-on the top plate of a sewing machine in the house, and that blood could not be so analyzed or detected after it had undergone heat that would coddle an egg. In our view the questions clearly call for evidence that was such in rebuttal, and were permissible. -
 

 Bills 50 and 57.
 

 The first of these bills discloses that the associate counsel for the state, in his argument to the jury, challenged defendants’ counsel to give a reason why Eustice Dunn was not placed on the witness stand, and the second of these bills discloses that the same 'counsel repeated this challenge during his argument.
 

 Eustice Dunn, as we have seen, was indicted in the same bill 'with the defendants herein, but the case was not called for trial as to him. Hence he was not upon trial when these defendants were tried. The trial judge says in his per curiam that he, “Eustice Dunn, was the only available witness who could apparently establish the whereabouts of his brother Byron.”
 

 In State v. Johnson, 151 La. 625, 92 So. 139, in which the defendant claimed to have killed the deceased in defense of his mother, it was held not to be beyond the scope of legitimate argument for the district attorney to comment upon the failure of the accused to put his mother on the witness stand. However, defendants contend that, as Eustice Dunn was charged with the murder of the deceased with them, they could not place him on the stand, and hence that the challenge to give a reason why they had not done so was improper for that reason also. In support of their contention that they could not have put their brother Eustice on the stand, they cite Act 157 of 1916, which provides, among other things, that:
 

 “In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes or offenses, a person so charged shall, at his own request, but not otherwise, be deemed a'competent witness; and his neglect or refusal to testify shall not create any presumption against him.”
 

 However, in our opinion this act has reference only to persons charged with the crime, when on trial therefor, and not to one who, though charged with the commission of the crime in the same indictment or information with others, is not on trial with them. Such person, in our view, may be sworn as a witness at the instance of those accused with him, whether or not he elects to be so sworn, though, as it is with any other witness, he
 
 *591
 
 cannot tie required to testify to anything that would incriminate him. Such was the view of the trial judge at the time he signed the two bills under consideration, but as we appreciate his statement, attached to the bills, when objection was made to the remark of counsel for the state, he was not free from doubt as to the right of counsel to make the remark, and hence, out of abundance of precaution, each time the remark was made and objected to he instructed the jury to disregard it. Since, in our view, Eustice Dunn could have been sworn, whether,he was willing or not, at the instance of the defendants then on trial, and since he was present at the trial, as appears from the per curiam of, the trial judge, and as he was apparently in position to throw light on the case, and seemingly the only available witness who could apparently establish the whereabouts of his brother, Byron Dunn, we are of the opinion that, under the ruling in State v. Johnson, supra, which we deem correct, the verdict should not be set aside because of the challenge uttered by counsel. Nor do we think that the verdict should be annulled because counsel reiterated the statement after the court had ruled against him. Such reiteration, if intentional, probably amounted to a contempt of court, but it should not carry with it the annulment' of the verdict in the absence of injury to the defendants. It is also our opinion that, even if we are in error in holding that counsel had a right to utter the challenge, still the fact that the court instructed the jury to disregard it each time it was made was sufficient to remove any prejudicial effect which otherwise might have flown from it. For these reasons we think that the bill is not well founded.
 

 Bill 51.
 

 This bill was taken to the failure of the trial judge to instruct the jury to disregard the following remark made by the district attorney in his argument to the jury and objected to by defendants, to wit:
 

 “The defendant Byron Dunn, having removed the car of the deceased, Sam E. Duhon, back of the premises, hastily returned to his shack and removed from his murderous body the blood dripping clothes.”
 

 The trial judge in his per curiam says that this remark, although somewhat intemperate, was the conclusion of an analysis of the evidence, which, if believed by the jury, fairly justified the remark.
 

 As the remark was based on evidence which, if believed, would fairly justify it, the remark was not improper. State v. Jackson, 142 La. 636, 77 So. 484.
 

 Bill 52.
 

 It appears from this bill that the district attorney in his argument before the jury made the statement that one of the defendants admitted that he lived in open concubinage with a negro woman. Defendants objected to this remark, and the court sustained the objection. In his per curiam, the judge says:
 

 “It was in evidence that on the night of the homicide, while the officers and two of the Dunns were at the burned home of the Dunns, an officer asked where the other brother was, whereupon one of. the brothers said that lie must be at the house of his negro woman. While this evidence was not objected to, the court considered that comments thereon would not assist the jury, and instructed them to disregard the comments. * * * ”
 

 Since there was evidence, although only hearsay, before the jury suggesting that one of the defendants lived in open concubinage with a negro woman, and since the judge sustained the objection urged and instructed the jury to disregard the remark, we think that neither of the defendants suffered any injury therefrom.
 

 Bill 53.
 

 This bill shows that the district attorney in his arguments before the jury made the following statement, to wit:
 

 “On February 22, 1925, these defendants were before the court in this same court room being tried for the violation of the Prohibition Law.”
 

 
 *593
 
 The defendants objected and excepted to the statement. The trial judge in his per curiam says:
 

 “Counsel first referred to the fact that these defendants had been tried in the same room for violation of the Prohibition Act, but corrected his remarks to correspond with the facts, which were that they were here for trial, but that the cases against them were dismissed. The court, however, again instructed the jury to pay no attention to any remarks outside of the record. There could be no injury, at any rate, for the defendants’ counsel throughout the trial accounted for many of their actions by the statement that they were violating the Prohibition Law.”
 

 'In view of the instructions given the jury by the court, and the fact that, during the trial, defendants’ counsel accounted for many of the actions of their clients by the statement that they were violating the Prohibition Law, we think that this bill shows no ground for a reversal of the verdict and sentence.
 

 Bill 54.
 

 In this bill it is recited substantially that the associate counsel for the state, during his argument, exhibited to the jury pictures from a book which did not pertain to this case, and that defendants objected and reserved-a bill to the exhibiting of the pictures to the jury. The counsel who exhibited the pictures has attached to the bill his statement of the occurrence. The trial judge has approved, as correct, this statement, thereby making it his per curiam. See State v. Fletcher, 127 La. 602, 53 So. 877. The statement shows that counsel read to the jury the decision of the Supreme Court of Nevada in the case of State v. Kuhl, 42 Nev. 185, 175 P. 190, 3 A. L. R. 1694, for the purpose of showing that palm prints were recognized as well as finger prints as a means of identification, and exhibited to the jury the reproduction of the two hand prints in the decision, as they appear in the Pacific Keporter, but did not hand the book to any member of the jury for inspection. Counsel, in a supplemental brief, cite authorities to show that it was error to permit the reading of the decision to the jury. We need not inquire, however, whether it was error to have permitted the reading of the decision or not, for no objection was made to its being read and no bill reserved thereto. The objection and the bill were only to the exhibiting of the pictures of the hand prints. We see no injury that could have possibly resulted to defendants from this act, for no member of the jury could have derived any information of any kind whatever by looking at or seeing the pictures in question.
 

 Bill 55.
 

 This bill shows that the associate counsel for the state, in his argument to the jury said, “I now speak with feeling”; and that defendants objected to the statement. There was no reason why counsel should not have made the remark, if he saw proper to make it, or even why he should not have spoken with feeling, if he saw proper so to speak. The remark is not susceptible of the interpretation, as suggested by defendants, that counsel was here adding the influence of his personal belief as to the guilt of the accused to the probative force of the testimony adduced upon the trial, and hence we need not consider what the effect would have been had he done so. The bill, in our opinion, is not meritorious.
 

 Bill 56.
 

 This bill shows that the associate counsel for the state said, in his argument to the jury, that the state had been denied the right to introduce certain evidence. The bill does not show what evidence counsel had reference to. Iri his per curiam the trial judge'says:
 

 “The remark was made, or begun, as charged but upon interruption by defense counsel, and instructions by the court, it was disclaimed by the speaker. There was no injury.”
 

 
 *595
 
 It was wrong for counsel to have made the remark. We understand, however, from the statement of the judge that, after the court had given its instructions with reference to the matter, counsel disclaimed that he had been denied such a right. Under these circumstances, we feel, as does the trial judge, - that defendants suffered no injury. The case of State v. Coleman, 140 La. 417, 73 So. 252, cited by defendants, is not pertinent here.
 

 Bill 58.
 

 After the court had delivered its general charge to the jury, defendants requested that the following special charge be given, to wit:
 

 “The chain of circumstantial evidence is no stronger than its weakest link.”
 

 When the request was made that this special charge be given, the court had already charged the jury relative to circumstantial evidence as follows:
 

 “Where the evidence is entirely circumstantial, the rule is that assuming all to be proved that the'evidence tends to prove, if there is any reasonable conclusion consistent with that proof other than the guilt of the accused, then the circumstantial evidence is insufficient to convict. In other words, the evidence, if entirely circumstantial, must be consistent with guilt and inconsistent with any reasonable theory of innocence.’-’
 

 The trial judge refused to give the special charge requested. In our opinion he was correct in refusing it, for not only had he charged the jury sufficiently as to circumstantial evidence, but this disconnected, incomplete statement, coming at the close of the charge, would have conveyed no definite meaning to the jury, but would ¿ave been confusing to them.
 

 Bill 59.
 

 The judge was also requested at the .close of. his general charge to instruct the jury as follows:
 

 “That; if there was any evidence of previous threats introduced by the state, before they could consider it as evidence against these defendants, it would be necessary that it be shown that any threat that might have been made was made by the defendants and against the deceased, and that such evidence would only be evidence against the defendant who had made such threat against the deceased.”
 

 The judge refused to give this special charge. At the time the request was made to give it, he had charged the jury as follows:
 

 “I charge you that statements made by either of the accused before or since the time of the crime charged against them, and admitted in evidence, may be considered by you, and that you are the judge of their weight as evidence under all the circumstances surrounding such statements, but with the following limitations :
 

 “No statements made by one of the defendants before the crime charged, out of the presence and hearing of the other, are to be considered as evidence against the other, unless and until you have found that they had formed a design, scheme, or conspiracy between them to commit the crime, and that the statement was made in furtherance of such design; and no statement by either of them, out of the presence and hearing of the other after the commission of the crime charged, is to be considered against the other. * * * ”
 

 We gather from the per curiam of the trial judge and from the original brief filed by defendants that the special instruction requested was intended to bear on the threat, which one of the state’s witnesses testified Byron Dunn had made, and which was discussed by us in passing on bill 29, relative to the motion to withdraw from the jury the evidence as to this threat. The threat, as will be recalled, was not made against the deceased specifically, but apparently against a class of which the deceased was a member. At the time the motion to withdraw was passed upon by the trial judge, he instructed the jury substantially to disregard the threat unless they found from all of the evidence in the case that it was made against a class or was such a threat as could be applied to the deceased.
 

 The special instruction requested is objectionable, because it required the jury, be
 
 *597
 
 fore they were authorized to consider the threat against even the defendant who made it, to find that it was made against the deceased, the instruction omitting altogether any reference whatever to the fact that it would have been sufficient for the jury to find that the threat was made against a class of whicbj the deceased was a member. The instruction requested is also objectionable, because it made it impossible for the jury to consider the threat against both defendants in the event the jury should find that the threat was made, pursuant to, and in furtherance of, a conspiracy, entered into by defendants, to commit the crime here charged, should the deceased give them any trouble in the exercise of the duties of his office. Eor these reasons we find no error in the refusal to give the special instruction requested.
 

 Bill 60.
 

 This bill was reserved to the overruling of a motion for a new trial. The motion is based on several grounds.
 

 One of these grounds is that the verdict of the jury is contrary to the law and the evidence. This ground presents nothing which we have the right to review.
 

 Another ground is that the court erred in its rulings, shown in the bills of exceptions, considered by us above. As we have considered these rulings, no further reference to them is necessary.
 

 Still another ground for the new trial prayed for is that the wives, sisters, and daughters of some of the jurors sat within the family circle of the deceased, fanned his widow, and consoled her and the daughter of the deceased, in the presence of the jury, during the trial. The motion negatives any idea 'that the defendants or their counsel knew of these attentions until after the rendition of the verdict herein. With reference to this ground for a new trial, which is supported by affidavits, the judge a quo says:
 

 “There was no ‘family circle.’ Some members of the Duhon family (the family of the deceased) sat during a large part of the trial
 
 with the general audience
 
 in chairs arranged inside of the bar railing. This space is large, and accommodated probably 100 chairs in addition to those of parties to the trial and counsel. The entire audience was under the eye of the court, as well as in plain view of the jury. Counsel for state and defense and the defense party with their chairs and tables, and newspaper reporters with their chairs and tables, sat nearer to the jury than any of the friends or relations of the deceased, and partly between them and the jury.
 

 “It is not true that friends comforted and consoled the wife of the deceased throughout the trial. I saw nothing but the ordinary polite conduct expected -of ladies and gentlemen in a public assemblage. The audience was remarkably quiet, attentive, and well behaved. I saw no conduct by any one at any time indicating bias or feeling by the. audience. Friends of the deceased and the accused mingled indiscriminately, except at the trial tables.
 

 “It may be that the wife and daughter of the juror Perkins sat near the widow of the deceased at one or more sessions, but, if so, it was a mere accident, and it is not true that they gave her any more than polite attention. It must be remembered that the trial consumed three weeks, and I cannot, of course, remember where each person sat at all sessions.” (Italics ours.)
 

 The court then states that he saw several of the wives and lady relatives of the jurors, mentioned in the affidavits, filed in support of this ground, present at several sessions of the trial, but did not observe any undue intimacy between them and the widow of the deceased, and then closes his per curiam on this phase of,the case as follows:
 

 “It was inevitable, of course, that a trial of considerable public interest would attract the public, including the relations and friends of jurors, who were drawn from the locality.
 

 “I repeat that there was no misconduct,' as charged; and, if there had been, the defendants and their counsel and their friends and relations who were present could not have failed to see it.”
 

 In our view, the foregoing statement of the trial judge is entitled to greater weight than the affidavits filed; by defend
 
 *599
 
 ants, which purport to show-a state of facts different from those certified to by the judge. The judge’s statement of what occurred or did not occur in his court, during the trial of a case, is entitled to great weight, if, indeed, it is not virtually conclusive. Moreover, the fact that neither defendants nor their counsel had any knowledge of the occurrences alleged by them until after the verdict strongly indicates, under the circumstances, that the occurrences did not take place, or else that they are greatly exaggerated. In our opinion this ground for a new trial is not well founded.
 

 In a supplemental motion for a new trial, defendants aver that they have discovered new evidence, which destroys one of the circumstances relied upon by the state for a conviction, and which further shows that one of the defendants, to wit, W. R. Dunn, is not guilty of the crime for which he was convicted.
 

 This evidence, to quote from the affidavit of Lee Granger, the witness by whom it is proposed to show the facts alleged, which affidavit is annexed to' the motion, is as follows:
 

 “That he (Lee Granger) had just finished his supper and heard a car on the Niblett’s Bluff road, and, thinking that it was the Croakers’ car, he looked out and saw the car that he had heard, but it was going west, when in fact the Croaker car would necessarily come from the west, and just after the ear had passed and liad gone about 300 yards west on said road he heard four or five shots; that he looked and could see the tail light on the car; that he looked at his watch and it was 7:45 p. m. o’clock.
 

 “That he and his wife left their home at 8:20 p. m. o’clock on that evening, and there were no other shots on the road or toward the Dunn home.
 

 “That the shots he heard were on the road toward the Dunn home from his home.”
 

 The trial judge says in his statement, attached to this bill, that:
 

 “New evidence is alleged. It consists of testimony of one Lee Granger that he heard shots at 7:45 p. m. All the evidence in the ease goes to show -that the deceased could not have reached the neighborhood until considerably later than this hour, and the evidence is wholly immaterial.”
 

 In our opinion the foregoing per cuidara disposes of this ground for a new trial.
 

 The motion also presents two. or three minor matters, which are not discussed in defendants’ briefs. We have considered them, however, but.find no merit in them. '
 

 Defendants filed an assignment of errors. However, in oral argument the assignment was abandoned, and hence requires no further notice.
 

 Our conclusion is, after carefully considering the record, that no reversible error appears therein.
 

 The verdict and the sentence appealed from are therefore affirmed.