470 So.2d 128 (1985)
STATE of Louisiana
v.
Raymond SMITH and Earl Smith.
No. KA 1916.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1985.
Rehearing Denied June 26, 1985.
*130 Dwight Doskey, and Clyde D. Merritt, New Orleans, for Raymond Smith.
Robert J. Zibilich, New Orleans, for Earl Smith.
Before REDMANN, C.J., and WARD and WILLIAMS, JJ.
REDMANN, Chief Judge.
Defendants appeal from their conviction of second degree murder, La.R.S. 14:30.1. We affirm the convictions.
Defendants' assignments of error attack juror selection, refusal to sever their trials, evidentiary rulings, sufficiency of the evidence, the timeliness of one jury charge on impeachment evidence and the correctness of another on lack of evidence, and refusal of a new trial.
The case against each defendant is circumstantial. The circumstances are established by credible evidence and permissible inferences from that evidence, viewed in the light most favorable to the prosecution, Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), notwithstanding some conflicting evidence. Because one assignment of error challenges the sufficiency of the evidence, we set forth the circumstances in some detail.

Facts
The strongest circumstances affecting Raymond Smith connect him with the murder weapon. That weapon was established by ballistics to be the Ruger .357 magnum pistol bought almost four years earlier by Raymond Smith's mother. Raymond Smith had at least easy access to and perhaps constant possession of that pistol about the time of the January 6, 1983 murder, and it was found in his possession 12 days after the murder. A former co-worker testified that in November 1982 Raymond showed him a pistol from the floor of his pickup truck, and that the murder weapon in evidence "appears to be the same weapon." Raymond Smith also showed it to him, although not so "directly," in December 1982: "I was passing in the car when he had it up inside his vehicle." Raymond Smith also had, in his bedroom at his house (not his mother's house), the box in which the murder weapon had been bought by his mother. He testified that it had been kept in the seafood store that his parents operated, until the store closed in August 1982, some time after his father's death. (It may here be said that his mother, whose testimony as a whole was filled with inconsistencies, testified that she took the gun itself home from the seafood store and put it in her bedroom locker and thereafter under the front seat of her car, which remained inoperable and unlocked from November 1982 until January 17, 1983.) Finally, as already said, the murder weapon was found in the possession of Raymond Smith as driver of his mother's car (with Earl Smith as passenger), on January 18, as the result of an unrelated traffic incident.
The strongest circumstances affecting Earl Smithwho knew the victim, as hereafter explainedare that he was seen at the murder scene, at the time of the murder, driving the victim's car away. The murder occurred at the intersection of East Judge Perez Drive and Riverbend Road, at about 6 a.m. on January 6, 1983. At that very intersection, and at that very time, Earl Smith was seen driving the victim's brown Camaro Z-28 automobile. The witness who saw him had "no doubt" it was he. Also seen by that witness, at that same time and place, was a light-colored automobilenot light green, like the car of the woman that Earl Smith lived with, and not a light-colored pickup truck like Earl Smith's pickupa light-colored automobile. Raymond Smith's mother had the use of a white automobile loaned to her at that time because her own carto which Raymond had a set of keys and of which he therefore presumably had some usewas disabled. The victim's automobile was found on the day of the murder, near a meat market 2.3 miles from the murder scene, wiped clean of fingerprints.
*131 Raymond Smith and Earl Smith were cousins, "were close," in Raymond Smith's words. Raymond Smith "was seeing," for some months before the murder, a woman who lived on the same street as Earl Smith and with whom he spent nights at Earl Smith's house. Raymond Smith shot at least one hole in the ceiling of Earl Smith's house in the presence of that woman. That woman testified that the two Smiths acted "close" towards one another, "helped one another a lot." "Q. How often would Raymond and Earl Smith be together? A. All the time."
The victim's body was still warm, and steam was rising from the pool of his blood, when the sheriff's sergeant arrived at 6:20 a.m. Two shots had been fired through the victim's head from the back, by a pistol held against his head, as he lay on his face on sandy soil, his wrists bound behind his back with an electrical cord. Imprints as if from tennis shoes were visible in that sandy soil; a cast of one footprint was made.
When the Ruger .357 magnum taken from Raymond Smith and Earl Smith in the unrelated traffic matter proved to be the murder weapon, search warrants were obtained for both of their homes.
At Earl Smith's house, on a door, a partial footprint was found that matched the footprint cast from the murder scene and that was "the same size" as Earl Smith's footprint. (We are aware that a 16-year-old neighbor testified that he made that footprint on the door, with tennis shoes that, he and his mother testified, she threw away.) Also seized at Earl Smith's house was an unusual quantity25 or 30 piecesof electrical wire and cords (although none of these was part of the electrical cord, with plug on one end and switch in the middle, that bound the victim's hands).
At Raymond Smith's house the murder weapon's box was found, as noted above.
Earl Smith knew the victim. Some of Earl Smith's neighbors knew the victim as a visitor to Earl Smith's house. One testified that the victim visited Earl Smith's house two or three times in the first "week" of 1983 (the murder was January 6). The woman with whom Earl Smith lived knew the victim. She was known to some of the victim's relatives who worked with him at a family-owned restaurant; she was always waited on by the victim, always ate steak, and never paid. She was the subject of the telephone conversation discussed in the next paragraph.
Although both defendants assign it as error to have admitted this testimony, a woman who identified herself as the victim's mistress, all of whose expenses were paid by him, testified concerning a telephone call she received from the victim that lasted from 1:30 until 2:30 or 2:45 o'clock the morning of the murder. The mistress testified that she and the victim, during that telephone conversation, spoke of the woman who lived with Earl Smith. The victim called that woman his "whore." The mistress was expecting the victim to go to her home after the restaurant closed early that morning, but in the course of that telephone call he told her that he would not go to her home. "I asked him why he wasn't coming over, and he said he was going by his whore's house down the road.... [H]e said I wasn't doing what he wanted.... Q. What did he want? He said he wanted oral sex.... He said [the woman who lived with Earl Smith] would give him that for 30, 40, 50 dollars."
The record contains, naturally, much other testimony that might or might not support the jury's inferences, at least collaterally. But the most important evidence is recited above.

Assignments of Error

I
We first treat Raymond Smith's argument that the evidence does not suffice to identify him "as one of the perpetrators." We disagree. The standard of proof is set by La.R.S. 15:438: "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *132 See State v. Wright, 445 So.2d 1198 (La.1984).
Raymond Smith's hypothesis is, simply, that Earl Smith took the gun (from Raymond Smith's mother's house) and alone killed the victim. Raymond Smith's relation to the murder weapon both before and after the murder, however, and his relation to Earl Smith, are both so close, and the details of the crime and the leaving of the victim's automobile so strongly support the involvement of two persons, that a reasonable jury could exclude that hypothesis, and, we believe, any other reasonable hypothesis of innocence.
That particular hypothesis relies upon Raymond Smith's own and his mother's testimony about the gun's being kept in the disabled, unlocked car, which does not appear to merit and apparently was not given credibility by the jury. The jury could reasonably have inferred that when Raymond Smith took the gun box home, when the seafood store closed in August 1982, he also took the gun home; that he kept that gun in his pickup truck or otherwise in his possession thereafter until the police recovered it from him 12 days after the murder. In that view of the evidence, Raymond Smith is seen as the holder of the murder weapon who lied on the witness stand by denying all connection with the murder weapon save being his mother's son. A reasonable jury, considering also all the other circumstances present in this case, could exclude every reasonable hypothesis of Raymond Smith's not being a principal to this murder.
The final question on review must be whether the evidence as a whole, taken in the light most favorable to the prosecution, supports the jury's exclusion of every reasonable hypothesis of innocence. We cannot articulate any reasonable hypothesis of Raymond Smith's innocence that would jibe with all the evidence the jury had. We therefore find no insufficiency of evidence, considering the jury's responsibility in fixing credibility and drawing reasonable inferences, for the jury's identification of Raymond Smith as a principal to this murder.

II
Raymond Smith also assigns as error the refusal of his many motions to sever his trial from that of Earl Smith. La.C.Cr.P. 704 grants a defendant severance, despite the general rule of joint trial of jointly indicted defendants, when the court "is satisfied that justice requires a severance." Whether justice requires a severance
"must be determined by the facts of each case. However, it is clear that defenses of co-defendants are mutually antagonistic where each defendant attempts to place the blame on the other. Under such circumstances, a defendant must defend not only against the state, but also against his co-defendant. In such an instance, justice would require a severance." State v. Thibodeaux, 315 So.2d 769 (La.1975).
Mere assertion that defenses will be antagonistic, however, does not require severance, State v. Prudholm, 446 So.2d 729 (La.1984); the mover must demonstrate that defenses to be presented will be antagonistic, State v. Turner, 365 So.2d 1352 (La.1978). No such showing occurred in our case. The defense of Raymond Smith was an alibi; the defense of Earl Smith was that at 6 a.m. on January 6, 1983, there was insufficient light for him to be seen under the circumstances. Neither attempted to introduce evidence of the other's guilt, or to place the blame on the other; neither had to convict the other in order to go free. Thus neither was in the position of having to battle both the state and his co-defendant.
Nor did this joint trial inhibit putting on a defense, as in State v. Webb, 424 So.2d 233, 237 (La.1982)if that be a separate ground for severance. The court there agreed with mover that joint trial prevented cross-examination of his codefendant regarding the codefendant's statement that was exculpatory as to mover, "a deprivation of his constitutional right to put on a *133 defense." There is no statement by Earl Smith here, as there was in Webb, that was exculpatory as to Raymond Smith but as to which Raymond Smith suffered from inability to call codefendant Earl Smith as a witness. There is also no suggestion by Raymond Smith that Earl Smith could present other exculpatory evidence at a separate trial. Raymond Smith testified that he was at his home at the time of the murder, and not with Earl Smith; thus there is no way that Earl Smith could testify that Raymond Smith was at his home. Nor could Earl Smith testify that Raymond was not at the murder scene, for to do so would place Earl there. If Earl were willing to give up his constitutional privilege against self-incrimination, he could do it as easily at a joint trial as at a separate trial. See State v. Barkley, 412 So.2d 1380 (La. 1982). Severance was not required.

III
Raymond Smith asserts as error the trial court's "allowing codefendant Earl Smith to excuse jurors this defendant deemed acceptable." This argument, in its foundation, is similar to the severance argument, and was made with the latter argument in brief.
Jury selection in our system proceeds on the principle that, out of an otherwise properly selected venire, every venireman is qualified unless cause to excuse is found. An accused must therefore accept the jury that is drawn, with the right, however, to exclude a limited number by challenge not for cause, but because of intuition, or suspicion, or mere discomfort regarding a venireman individually or as a member of a class. Thus the accused's right in making up the jury, other than to excuse for cause, is a limited, negative one: the accused has the right to say not who shall be, but only who shall not be, on the jury.
The system allows the same number of peremptory challenges to the prosecution, and thus, always, the prosecution may delete a limited number of veniremen who are acceptable to the defendant.
Adding a codefendant does increase the number of peremptory challenges not within the first defendant's controlin fact, triples their number. The added defendant, in a mandatory hard labor case, gets the same 12 challenges the first defendant got, and the state gets 12 for each defendant. C.Cr.P. 799. The mathematical possibility thus exists that a defendant who could only have lost 12 acceptable jurors to peremptory challenge, if tried alone, could lose 36, if tried with a co-defendant. That mathematical possibility is a real possibility, however, only when the codefendants occupy such antagonistic positions that it is to the advantage of the one to have jurors opposed to the otherin which case either would be entitled to a severance on that ground. We therefore reject this assignment of error.

IV
Earl Smith claims error in the denial of his challenge for cause of a juror who said that, because of what she had read in the newspaper, she
"would have to hear some proof of their innocence before I can make a fair decision.... There are some things I read in the paper puts a question in my mind. I'd like the answers to that to give me a better feeling toward the whole case. Q. [by Earl Smith's counsel] If we didn't prove to you that they are innocent A. It would just stick in my mind. The question would still be there. It would be unanswered."
Yet that juror then responded to Raymond Smith's counsel, "I would have to give him the benefit of the doubt" if there were no evidence as to Raymond Smith. That juror's answer to Earl Smith's counsel therefore cannot have meant that she would vote guilty unless defendants proved themselves innocent, as Earl Smith in effect argues. As in State v. Davenport, 445 So.2d 1190 (La.1984), "the trial judge evidently decided that the juror, by his final answer, indicated a sufficient willingness to follow the law and accord the defendant *134 the presumption of innocence, and we cannot say that he was clearly wrong in this judgment." It was not error to refuse the challenge for cause.

V
Earl Smith complains of the trial judge's allowing testimony of a "beating" of the woman who lived with Earl Smith, arguing that C.Cr.P. 770 requires a mistrial if the prosecutor refers to "another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible." We find no reference to any crime allegedly committed by Earl Smith. The testimony was that Earl Smith and the woman had been at but left the witness's house one afternoon, and some time thereafter the woman returned, crying and with her mouth bleeding, and used the witness's telephone to call her brother to come get her. There is not a word in that witness's testimony that identifies the mouthbleed as being other than from natural or accidental cause, not a word that charges Earl Smith with having caused the mouthbleed, much less by "beating" or other crime. We reject this assignment of error.

VI
Both defendants assign as error the refusal to charge the jury on the limited import of impeachment evidence at the time of the impeachment rather than at trial's end, citing State v. Willis, 241 La. 796, 131 So.2d 792 (1961), State v. Denis, 384 So.2d 419 (La.1980), and State v. Ray, 259 La. 105, 249 So.2d 540 (1971). (Defendants also cite State v. Barbar, 250 La. 509, 197 So.2d 69 (1967), in which no precautionary instruction had been given, and which thus cannot hold that an instruction at trial's end is insufficient. They also cite State v. Laprime, 437 So.2d 1124 (La.1983), which affirmed a conviction, and therefore is not authority for reversing a conviction.)
The prior inconsistent statements in Willis (that defendant had shot the witness as charged), Denis (that defendant was a participant with the witness in the burglary charged), and Ray (that defendant told the witness he committed the arson charged) each purported to be a statement by the witness that defendant committed the crime charged or that defendant said to the witness that he committed the crime charged. Statements of that character demand a prefatory or contemporaneous warning to the jury that they must not accept such a prior inconsistent statement as proof of the statement's content. It might be preferable, as a general rule, to give a prefatory warning in every case of attempted impeachment of a witness. But the defendant must still request the limiting instruction, Laprime, supra. Moreover, impeaching evidence is not even admissible as to "collateral facts and irrelevant matter," R.S. 15:494, not because mistakable as evidence of guilt but because a distraction and a time-waster: and distraction and time-wasting is surely not cause for reversing a conviction.
There is no rule that every case must be reversed if the limiting instruction is not contemporaneously given. The rule of Willis et al. is only that the limiting instruction is indispensable to affirmation if the prior inconsistent statement is that the witness saw the defendant commit the crime or was told by the defendant that the defendant committed the crime. Perhaps the broadest expansion of the principle of those cases is that the limiting instruction must be given when the prior inconsistent statement asserts some matter that the state must prove in order to convict.
The prior inconsistent statements here are not even of that expanded category, much less of the narrow category of Willis et al. The prior inconsistent statements here related to whether Earl Smith had visited Raymond Smith's mother's house within two months prior to January 1983, whether Raymond Smith's sister had a third set of keys to the mother's car, and whether the car's back door lock worked. The state was not obliged to prove anything in respect to any of those matters. Those statements could not do much harm even if the jury deemed their content proven. *135 Defendants' trial was not unfair because of failure to instruct contemporaneously against accepting those prior statements as proof of their content. We reject this assignment of error.

VII
Both defendants argue error in the trial court's allowing the victim's mistress to testify about the victim's telephone conversation with her the morning of his killing. Defendants argue that that testimony was inadmissible hearsay. We disagree. It would be foolish to keep from a jury that a victim of murder, scant hours before his killing, had made a statement expressing an intent to go to the home of a person otherwise circumstantially implicated in the killing. That statement, unless it intended deceit, is evidence of the victim's then present intent, and the intent is some evidence that the victim carried out the intent and went to Earl Smith's house the morning of his killing.
Wigmore, Evidence (Chadbourn rev.), § 1714, declares: "Statements of a person's own mental or physical condition have long been the subject of an exception to the hearsay rule." In respect to the admissibility of statements of intent to act, Wigmore adds at § 1725:
"[T]he existence of a design or plan to do a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct. But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present exception by the person's own statements as to its existence.
"The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this exception: namely, the statements must be of a present existing state of mind, and must appear to have been made in a natural manner and not under circumstances of suspicion." (References omitted.)
State v. Morgan, 142 La. 755, 77 So. 588 (1917), and State v. Dunn, 161 La. 532, 109 So. 56 (1926), both hold admissible over hearsay objection a murder victim's declaration of intent to go to defendant's home or vicinity. See also State v. Vial, 153 La. 883, 96 So. 796 (1923), holding admissible the decedent's declaration of intent in going into the accused's place of business; State v. Tonubbee, 420 So.2d 126 (La.1982), holding admissible a victim's declaration showing her state of mind shortly before death (fear of or emotional reaction to defendant); Uniform Rules of Evidence § 803(3), excepting from the hearsay rule a "statement of the declarant's then existing state of mind, ... such as intent, ...." (See also Wigmore, § 1576, for a general discussion of admissibility of decedents' utterances.)
It was not error here to admit the testimony of the victim's statement.

VIII
Both defendants also assign as error the trial judge's jury instruction, arguing that he instructed the jury that it could not go beyond the evidence to find reasonable doubt as to the guilt of defendants. The instruction included:
"The burden is upon the state to prove each of the defendants' guilt beyond a reasonable doubt. In considering the evidence, you must give the defendants the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of either of the defendants beyond a reasonable doubt, you must find [him] not guilty.
. . . . .
"You are prohibited by the law and your oath from going beyond the evidence to seek for doubts upon which to acquit the accused, but must confine yourselves strictly to a dispassionate consideration of the testimony upon the trial. You must not resort to extraneous facts or circumstances in reaching your verdict, nor are you at liberty to adopt *136 unreasonable theories or suppositions in considering the evidence in order to justify a verdict of conviction." (Emphasis added.)
That instruction uses C.Cr.P. 804's words, "give the defendants the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence." Furthermore, the latter portion of that instruction, argued by defendants to negate the first portion, is more balanced than that of State v. Gibbs, 355 So.2d 1299 (La.1978), in that it instructs the jury, as our emphasis shows, not to go beyond the evidence either to acquit or to convict. This charge is therefore unlike that held defective in Gibbs and State v. Vessel, 450 So.2d 938 (La.1984), which told the jurors not to go beyond the evidence "to acquit" and, worse, did not instruct at all on the defendant's entitlement to the benefit of any doubt arising from lack of evidence. A reasonable jury considering our charge as a whole would know that the state has the burden of proof and the defendant has the benefit of any doubt that arises from the evidence or from the lack of evidence. If the instruction is less than academically perfect because of its latter portion, it would not have misled a reasonable jury that considered it as a whole.

IX
Earl Smith ascribes error to the denial of a new trial to admit testimony from a couple who discovered the victim's body. Their testimony would have been that when they discovered the body at about 5:45 or 5:50 a.m. they could barely make out that there was a body; and when the police arrived light was still so poor that the detectives had to use the dome light in the police car to record their statement.
C.Cr.P. 851(3) provides a new trial if:
"New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty."
This evidence would not probably have changed the verdict. It is inconsistent, of course, with that of the witness who firmly identified Earl Smith as the person she saw by natural light at about 6 a.m., driving the victim's car. But the jury had heard similarly conflicting evidence, including testimony from two ferry captains of the absence of light at 6 a.m. that day, and testimony of the time of sunrise that day and how long before sunrise there is light. The jury believed instead the testimony of the police officers that there was light, and that of the identifying witness that there was light by which she saw, "no doubt," Earl Smith driving the victim's car as she looked to see whether it was a co-worker with some problem that forced a U-turn. We simply cannot say of that new testimony that "it would probably have changed the verdict or judgment of guilty." It therefore was not error for the trial judge to refuse a new trial on that ground.
Affirmed.
WARD, J., concurring in part and dissenting in part with opinion.
WARD, Judge, concurring in part and dissenting in part.
I concur in the affirmation of the conviction of Earl Smith. I think the Court adequately treats issues raised on appeal by Earl Smith although the accumulation of questionable trial decisions is troublesome, particularly the decisions as to severence and jury instructions. The denial of a severence and the jury instructions do not have a highly prejudicial impact on Earl Smith since the State's evidence against him is strong. Hence, I would affirm Earl Smith's conviction.
On the other hand, I disagree with the Court's affirmation of Raymond Smith's conviction. The evidence simply does not support a conviction of Raymond Smith for second degree murder. I believe that the denial of severence and the misleading jury instructions caused the jury to err in assessing *137 the evidence which was purely circumstantial as to Raymond Smith. Moreover, I believe the Trial Judge erred when he did not set aside the verdict because a rational trier of fact could not conclude that Raymond Smith's guilt was proved beyond a reasonable doubt under the Jackson standard. This is especially true when considering Louisiana's law of circumstantial evidence, La.R.S. 15:438, a component of that rule. State v. Wright, 445 So.2d 1198 (La.1984).
For the purpose of this opinion, I will first discuss the State's evidence, or the lack of it, as to Raymond Smith. Next I will discuss the issue of jury instructions, and finally, the denial of the severence.
Even considering the evidence in the light most favorable to the State, no one questions that the evidence as to Raymond Smith is purely and only circumstantial while there was an eyewitness who saw his cousin, Earl Smith, leaving the scene of the murder. Stripped of the relationship between Earl and Raymond, the evidence against Raymond may be summarized to show its bare bones.
Earl and Raymond were cousins, close friends, and often seen in each other's company. The murder weapon was purchased by Raymond Smith's mother four years before the murder. The box that contained the murder weapon when it was purchased by his mother was found in Raymond Smith's house. Raymond Smith was in possession of the weapon in November and December of 1982. The victim was murdered during the commission of an armed robbery that occurred January 6, 1983. The victim, his hands bound behind his back with electrical wire, was found lying in a pool of warm blood at approximately 6:00 a.m. that morning. Earl Smith was seen driving away from the area where the body was discovered. Raymond Smith was not seen in that area. On January 18, 1983, when Raymond Smith and Earl Smith were arrested on unrelated charges, Raymond Smith told the police a .357 Ruger could be found under the seat of the vehicle in which he and Earl were riding. This was the weapon used to kill the victim. I find no other evidence, even when considered in the light most favorable to the State, that would support a conviction of Raymond Smith. Nevertheless, the majority does find sufficient evidence. I shall attempt, however, to show that no other evidence exists.
As I understand the majority, it places great weight on the probability that Raymond had easy access to the murder weapon. But so did Earl. I do not find either inference remarkably significant. Additionally, the majority considers it important that Raymond exhibited the weapon to a co-worker in November of 1982. While that evidence is scanty, I consider the fact proven because the evidence must be considered in the light most favorable to the State. However, I doubt that it is entitled to any weight because Earl had access to the gun after November 1982, shortly before the crime.
The majority emphasizes testimony that shortly before the murder, Raymond had shot up the ceiling in Earl Smith's house, but I find no significance or relevance to that testimony because the weapon he fired into the ceiling was a .22 caliber pistol while the murder weapon was a .357 magnum. This testimony may prove Raymond is a fool, but it does not prove he is the murderer.
I am not sure I understand the significance the majority attaches to the testimony that established another light colored automobile"not light green, like the car of the woman Earl Smith lived with, and not a light colored pickup truck like Earl Smith's pickup, a light-colored automobile"was seen driving from the area where the body was discovered. If the majority concludes, as the opinion implies, that this was the car that Raymond Smith's mother borrowed from a friend, and hence, Raymond had access to a light colored automobile, and that he used it to follow Earl to aid him in the crime, then I find this to be singularly unpersuasive. It is an inference based upon an inference which was drawn from an unproven fact.
*138 Neither do I find persuasive the conclusion reached by the majority that because the facts strongly suggest that two people participated in the crime, the jury could reasonably conclude that those two people must have been Earl and Raymond. Equally as plausible is that the two people who committed the crime were Earl and the prostitute with whom he lived. There is evidence to establish that a few hours before the murder the victim visited the prostitute at Earl's house. There is no evidence to show that Raymond was there or that the victim even met Raymond that night.
The meager evidence against Raymond highlights the vice of the misleading jury instructions which illustrate the wisdom of the Supreme Court's warning of the pitfalls of going beyond what is required by La.C. Cr.P. art. 804 to define reasonable doubt. State v. Vessel, 450 So.2d 938 (La.1984). Article 804 provides:
A. In all cases the court shall charge the jury that:
(1) A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;
(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and
(3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.
The court may, but is not required to, define "the presumption of innocence" or "reasonable doubt" or give any further charge upon the same than that contained in this article.

* * * * * *
In this case the Trial Judge went far beyond what is required. His instructions are misleading, and I believe, incorrect.
The burden is upon the State to prove each of the defendants' guilt beyond a reasonable doubt. In considering the evidence, you must give the defendants the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence. If you are not convinced of the guilt of either of the defendants beyond a reasonable doubt, you must find them both not guilty. Tr. Vol. IX jury instruction pg. 4.

* * * * * *
You are prohibited by the law and your oath from going beyond the evidence to seek for doubts upon which to acquit the accused, but must confine yourselves strictly to a dispassionate consideration of the testimony upon the trial. You must not resort to extraneous facts or circumstances in reaching your verdict, nor are you at liberty to adopt unreasonable theories or suppositions in considering the evidence in order to justify a verdict of conviction. Tr. Vol. IX jury instructions pg. 6.
The first portion of the charge closely follows La.C.Cr.P. art. 804A(2) and (3). The second, however, erroneously restricts the jury to evidence before it at trial to support a reasonable doubt. Those instructions prohibit the jury from going outside the trial evidence to find a reasonable doubt. Thus, the jury charge, considered as a whole, does not provide a correct explanation of the law. Rather, it is obviously contradictory and apparently confusing so that a jury could not understand that it was permitted to consider evidence not presented at trial or that it could consider the lack of evidence in its determination of whether a reasonable doubt exists.
Finally, I believe it was error to deny Raymond Smith's motion for a severence of his trial from that of Earl Smith. While a severence was not mandatory because the defendants did not present mutually antagonistic defenses, State v. Prudholm, 446 So.2d 729 (La.1984), I believe in the interest of justice Raymond Smith should have been tried separately. Whether justice requires a separate trial must be determined by the *139 facts of each case. State v. Turner, 365 So.2d 1352 (La.1978). The facts of this case warrant severence. The evidence against Earl Smith is strong, while that against Raymond Smith is weak. The evidence against Raymond Smith which the majority apparently feels most damning, is his association with his cousin, Earl Smith. Pairing the two at the same defense table underscores the association, making it more difficult for the jury to separate evidence against one from that against the other.
For these reasons, I would reverse the conviction of Raymond Smith and either discharge for lack of evidence or remand for a new trial because of trial error.