571 So.2d 195 (1990)
STATE of Louisiana
v.
Norbert CAMP.
No. 89-KA-0158.
Court of Appeal of Louisiana, Fourth Circuit.
November 29, 1990.
Harry F. Connick, Dist. Atty., Val M. Solino, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
M. Craig Colwart, Orleans Indigent Defender Program, New Orleans, for defendant/appellant.
Before SCHOTT, C.J., and WARD and BECKER, JJ.
BECKER, Judge.
Norbert Camp was indicted for the second degree murder of Rose Stewart. He was arraigned and pled not guilty. A twelve-member jury found him guilty of manslaughter. He was thereafter sentenced to serve twenty-one years at hard labor.[1] He now appeals, relying upon two assignments of error for a reversal of his conviction and sentence.
At approximately 8:30 a.m. on December 16, 1987, Rose Stewart fell to her death from her third-story bedroom window at 3711 N. Dorgenois Street. An autopsy of Ms. Stewart revealed she died of internal injuries which included punctured lungs, a bruised heart, and internal bleeding. However, there were no injuries to her feet or *196 legs. Her hands contained small cuts which were consistent with defensive wounds made by a knife. Ms. Stewart's arms were found to have track marks, many recently made, but there were no traces of alcohol or other commonly abused substances. Officers investigating the scene discovered blood stains in various places in the apartment, including the window sills in both the kitchen and in the bedroom, the latter being the window through which Ms. Stewart fell. Although Ms. Stewart had type "O" blood, some of the blood spatters, including those found on the bedroom window sill, both inside and outside, were found to be type "B" blood. It was also discovered that the burglar bars on one of the kitchen windows were bent. A knife was seized near the scene.
Approximately one half hour earlier, Ms. Barbara Leeper, who lived in the apartment below Ms. Stewart, saw the defendant Norbert Camp walk up the stairs toward Ms. Stewart's apartment. Ms. Leeper saw Ms. Stewart's two daughters leave for school, and then she heard a loud argument and the sound of breaking glass coming from Ms. Stewart's apartment. She heard Camp shout to call the police, and she heard Ms. Stewart yell something about contacting "Sheila". Ms. Leeper left her apartment and apparently contacted someone named Sheila Allen, who called the police. Ms. Leeper's daughter, who was also in her apartment, testified she heard Camp tell Ms. Stewart he would beat her again unless she told some children, who had gathered outside the apartment building, to disperse. When Ms. Leeper returned, she saw Camp coming down the stairs carrying a knife dripping with blood.
Angie Stewart, Ms. Stewart's daughter, testified the defendant arrived before she and her sister left for school. She testified her mother was getting ready to go to work at Goodwill Industries on Broad Street in New Orleans. She testified there was no blood in the apartment when they left, and the burglar bars on the kitchen window were intact. She further testified that when Camp entered the apartment, he kept looking out of the window and appeared to be scared. She and her sister left and then came back because her sister complained of a stomach ache. Camp asked them if anyone was on the stairs with them. They left again soon thereafter.
Officer John Martin, who answered the initial call, testified that as he neared the scene of the reported disturbance, he saw a body fall from a third-story window and hit the ground. He stated he looked up at the window and saw Camp standing there, looking out. When Camp saw the officer looking at him, he backed away from the window. Officer Martin then went to attend to Ms. Stewart, and as he was waiting for help to arrive, he saw Camp run from the building. The officer gave chase and eventually observed Camp kick in a door at 2524 Congress Street, the home of Forrest Harper. Camp was apprehended inside Mr. Harper's apartment.
Forrest Harper was lying in bed when he heard a noise at his front door. He armed himself and found Camp standing in his front room. Camp pleaded with him not to let "them" kill him. Camp was covered in blood and had a hard time standing. He asked Harper to call the police. Mr. Harper testified he looked out of his window and saw three men, one with a shotgun, standing across the street from his apartment. It was then that Officer Martin arrived and arrested Camp. Because Camp's hand was bleeding, Officer Martin escorted him to Charity Hospital.
Both Officer Martin and Mr. Harper testified that Talita Elder, the daughter of Camp's girlfriend, arrived at Harper's apartment soon thereafter, and told them that Camp did something "too wrong" to Ms. Stewart. Officer Martin testified Elder told them she saw Camp holding a knife and ordering Ms. Stewart to open a kitchen window, threatening to stab her if she did not do so. He also testified that she stated she saw Camp try to push Ms. Stewart through the kitchen window, bending the burglar bars in the process, but he was unsuccessful. He testified she told them she then saw Camp drag Ms. Stewart to the bedroom, where he "pitched" the victim *197 out of the window. Harper verified those statements in his testimony.
Officer Martin testified the death of Ms. Stewart did not appear to have been a suicide. He also testified that Mr. Harper did not mention the three men with the shotgun standing across the street from his apartment. He admitted his police report did not mention that he had seen Camp at the window after Ms. Stewart fell, and he did not know why this fact had been omitted.
Talita Elder, called as a state witness, denied making the statements at Mr. Harper's apartment which implicated Camp in Ms. Stewart's death. She admitted going to Mr. Harper's apartment, but she insisted she only told him she was sorry for the mess Camp had made there. She testified that earlier that morning Camp called to her and asked her to come to Ms. Stewart's apartment. Upon her arrival she heard Camp begging for someone to call the police and to keep "them" from killing him. She went to the apartment door which led into the kitchen, and Camp was attempting to exit through this door at the time Ms. Stewart fell from the window. Ms. Elder also denied later telling a homicide detective that she heard someone say Camp was pushing Ms. Stewart out of a window and that she arrived in front of the building in time to see Ms. Stewart fall.
The defense attempted to present two different explanations for Ms. Stewart's death: (1) suicide, or (2) death at the hands of other men who were on the scene, the same men who Mr. Harper saw standing outside his apartment. To support the first theory, the defense called various ex-boyfriends, all of whom had criminal records and all but one of whom were incarcerated at the time of trial. These men testified to Ms. Stewart's drug use and her mental instability. One man testified that Ms. Stewart talked often about suicide, and another testified Ms. Stewart threatened to jump out of her bedroom window when he found her in bed with another man. Ms. Leeper testified Ms. Stewart was "taken away" once four or five years prior to her death. The defense also presented Ms. Stewart's psychiatric records, which indicated that she suffered from audio and visual hallucinations, paranoia, schizophrenia, low intelligence, and epilepsy. A psychiatrist who reviewed these records concluded Ms. Stewart's mental stability greatly improved when she was on medication, but that it deteriorated when she stopped taking the medication. He further testified he could find no evidence of any suicidal tendencies.
Norbert Camp denied pushing Ms. Stewart out of the window. He testified he saw Ms. Stewart at a local bar the night before, and she asked him to drive her to a job interview in Metairie the next morning. He arrived at her apartment at approximately 8:00 a.m., and Ms. Stewart's daughters left soon thereafter. He testified that while Ms. Stewart was getting ready, she called him into her bedroom. She was pacing nervously between the two bedroom windows, and he decided to wait in the kitchen. He looked out the window and noticed a man walking away from his car. He then saw a second man walk into the building. He noticed the back door was open, so he closed and locked it. Suddenly, he heard Ms. Stewart curse him and order him to stay away from the door. He turned and saw her standing in the doorway brandishing a butcher knife. At that moment, someone tried to open the door. He asked who was there, and the person began kicking the door. Ms. Stewart then attacked him with the knife, and they struggled for possession of it, resulting in the gash in his hand. He forced her to drop the knife, and kicked it away from her. He then ran to the window and yelled for someone to call the police. Although he did not have a gun, he threatened to shoot whoever was still kicking the door, attempting to frighten them.
Camp testified that Ms. Stewart got up from the floor, began throwing dishes, and they resumed their struggle which took them throughout the apartment. He stated someone again began kicking at the front door. Camp eventually broke free and returned to the kitchen where he yelled for help. When he looked out of the window he saw the man he had earlier seen *198 entering the building. He also saw Talita Elder, whom he called over. When she got to the locked kitchen door, he asked her if anyone else was in the hallway. Upon finding no one else was there, he escaped out the back door. He stated he saw the knife before he left and picked it up to protect himself from the person who tried to get in the apartment, however he lost it in the escape from the building. He continued running and noticed the men were following him. He then broke into Mr. Harper's apartment and begged him to protect him from the men outside and to call the police.
Camp denied being with Ms. Stewart when she fell from the window. He denied pushing her from the window, noting he had lost the use of his right hand due to the wounds he received in the struggle with Ms. Stewart. He also denied standing at the window after she fell. He insisted Ms. Stewart ran back toward the bedroom when he fled from the apartment. He testified he was unaware that Ms. Stewart had fallen from the window until after he was arrested. He denied there were police officers near the building when he ran from it, but admitted he was under the influence of cocaine while in Ms. Stewart's apartment, having injected it earlier that morning. He testified he had type "B" blood, and admitted having prior convictions for misdemeanor theft, aggravated battery, possession of narcotics, and being a convicted felon in possession of a firearm.

ERRORS PATENT
A review of the record for errors patent reveals there are none.

ASSIGNMENTS OF ERROR NO. 1
By his first assignment of error, the appellant contends the trial court erred by refusing to give a limiting instruction to the jury as to the use of impeachment testimony. In particular, he points to the prosecution's impeachment of Talita Elder with her alleged statement to Officer Martin and Mr. Harper that she saw the defendant "pitch" Ms. Stewart through the window.
During the testimony of Ms. Elder, she admitted she went to Mr. Harper's apartment, but she testified she merely apologized to Harper for the mess Camp made in his apartment. She insisted she did not make any statements concerning what she had observed. At that point, a bench conference was called, and the jury was removed from the courtroom. The State indicated it was surprised by Ms. Elder's testimony, and it sought to have her declared a hostile witness, allowing it to impeach her testimony. Ms. Elder was examined, and she denied telling Mr. Harper and Officer Martin that Camp had done Ms. Stewart "too wrong", that she had seen Camp order Ms. Stewart at knifepoint to open the kitchen window, saw him attempt to push her out of the window, bending the burglar bars in the process, and then drag Ms. Stewart to the bedroom and "pitch" her out the bedroom window. Officer Martin was then called to the stand, and he reiterated his previous testimony with regard to the statements made to him by Ms. Elder. Mr. Harper also again testified Ms. Elder told him and Officer Martin that she saw Camp push Ms. Stewart out of the window. After hearing argument from both sides, the court declared Ms. Elder a hostile witness.
The jury was then returned to the courtroom, and under cross examination by the State, Ms. Elder denied making the statements. The defense objected to the questions of the prosecution and requested that the trial court give a limiting instruction to the jury on the value of impeachment evidence. The court refused to do, stating: "I'm not going to instruct the jury on anything until the end of the case." A continuing objection was then noted by the defense with respect to every impeachment question asked of this witness. No such limiting instruction was given at the end of trial by the court.
The defendant does not now contend that the court erred by declaring Ms. Elder a hostile witness. Instead, he assigns as error the trial court's failure to give the jury a limiting instruction as to the purpose and weight of the inconsistent statements used *199 to impeach her. Trial in this case occurred on July 12, 1988, and at that time R.S. 15:487 provided:[2]
No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.
R.S. 15:488 provides:
"Surprise" in the sense of the last preceding article does not arise out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side.
Although prior inconsistent statements are permissible tools to impeach a witness, their use must be limited solely to this purpose and can not be used as substantive evidence of a defendant's guilt. Upon request by the defense, the court must give a limiting instruction to the jury regarding the use of such statements. State v. Williams, 445 So.2d 1171 (La. 1984); State v. Denis, 384 So.2d 419 (La. 1980); State v. Kimble, 375 So.2d 76 (La. 1979); State v. Ray, 259 La. 105, 249 So.2d 540 (1971); State v. Smith, 470 So.2d 128 (La.App. 4th Cir.1985), reversed on other grounds 491 So.2d 641 (1986). In Denis and Kimble, the Court reversed the defendants' convictions, finding reversible error in the trial court's refusal to give such limiting instructions when requested to do so by the defense. This court, in Smith, affirmed the defendants' convictions. However, this decision was based upon the fact that the inconsistent statements with which the witness was impeached did not concern any matter which the State had to prove in order to convict, but rather a collateral matter which was irrelevant. Having made that distinction, this court found that the trial court's failure to give the requested limiting instruction did not constitute reversible error. In addition, a limiting instruction was apparently given during the court's charge to the jury at the end of trial.[3]
Here, the statements with which the State impeached Ms. Elder bore directly upon the guilt of the appellant: that Ms. Elder witnessed him throw Ms. Stewart out of the window to her death. The defense repeatedly requested an instruction to the jury concerning the limited use of these inconsistent statements, but the trial court repeatedly refused to give such an instruction. Further, the court's charge to the jury at the end of trial did not include any such limiting instruction and in failing to do so, the trial court committed reversible error.

ASSIGNMENT OF ERROR NO. 2
Although we find reversible error in the first assignment of error, we will also consider defendant's second assignment of error since it is germane to a retrial.
The defendant contends there was insufficient evidence to support his conviction. Specifically, he contends that the only direct evidence which supported the State's theory that he pushed Ms. Stewart to her death was Ms. Elder's alleged statement that she saw him do it. The appellant is correct in his assertion that this evidence could not be used to support the State's case, having been introduced solely for impeachment purposes. In State v. Bertram, 517 So.2d 1264 (La.App. 4th Cir.1987), this court held that where prior inconsistent statements were used to impeach a State witness, these statements could not be used as substantive proof of the defendant's guilt. However, if the statements were not the only evidence of a certain element of the crime, the defendant's conviction should be affirmed. See also Williams, supra; State v. Laprime, 437 So.2d 1124 (La.1983).
As this court noted in State v. Vivian Heck, 560 So.2d 611 (La.App. 4th Cir.1990):
In evaluating the sufficiency of evidence to support a conviction, an appellate *200 court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 [61 L.Ed.2d 560] (1979); State v. Jacobs, 504 So.2d 817 (La.1987). Where the conviction is based upon circumstantial evidence, R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Langford, 483 So.2d 979 (La.1986). R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; it is merely an evidentiary guide for the jury when considering circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985).

Heck, supra. at 615.
The appellant was convicted of manslaughter, which is defined by R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1.
Because "heat of blood" or "sudden passion" are mitigating factors which lessen the culpability of the crime, and not essential elements of manslaughter, the defendant must establish them by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986); Heck, supra.
The appellant made no showing of either of these elements. However, he was originally charged with second degree murder, which is defined in pertinent part as: "[T]he killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm." R.S. 14:30.1. A similar situation arose in State v. Schrader, 518 So.2d 1024 (La.1988), where the defendant was charged with murder and convicted of manslaughter. The Court noted:
The appellate court was correct insofar as it held that, absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not that verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a "compromise" verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982). However, and as Elaire made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. Id at 251.

Schrader, at 1034.
Here, the defendant does not argue that the facts of this case are inappropriate for a manslaughter conviction. Instead, he contends there is insufficient evidence he committed the murder because the only direct evidence to link him to the victim's death was Ms. Elder's alleged statement, which could have been considered only for impeachment purposes. He argues that the remaining evidence, all circumstantial, does not exclude the reasonable hypotheses of innocence, which are that Ms. Stewart jumped from the window of her own accord, or that she was pushed by the men he testified were trying to break into her house and who chased him to Mr. Harper's apartment. However, Officer Martin testified he looked up after seeing Ms. Stewart *201 hit the ground, and saw the defendant looking out of the window. In addition, blood smears of a type matching the defendant's (type "B") were found on the window sill of the window from which Ms. Stewart fell, both on the inside of the sill "and on the brick outside portion of the window sill."[4] Patsy Daniels, a medical technologist from the Orleans Parish Coroner's Office, testified Ms. Stewart had type "O" blood. Viewing the evidence in the light most favorable to the prosecution, the jury could have discounted the testimony of the defendant and of Ms. Elder that the appellant was in the kitchen when Ms. Stewart went through the window. It could have also discounted Camp's theories that the men who chased him into Mr. Harper's apartment actually pushed Ms. Stewart to her death, or that she jumped. Because the evidence supports a finding that the defendant committed second degree murder, it is also sufficient to support his manslaughter conviction. Schrader, supra. Therefore, this assignment has no merit.
Accordingly, defendant's conviction is reversed, his sentence vacated and the matter is remanded to the trial court for further proceedings consistent with this opinion.
CONVICTION REVERSED; SENTENCE VACATED; REMANDED.
NOTES
[1] Although the minute entry of sentencing reflects his sentence was imposed without benefit of parole, probation, or suspension of sentence (R. 16), the sentencing transcript reveals no such prohibition was imposed.
[2] This section, along with other sections of Title 15, were repealed effective January 1, 1989, and superseded by the Code of Evidence.
[3] On review, the Supreme Court reversed the opinion of this court, on sufficiency grounds as to one defendant, and as to the other defendant on the ground that the trial court improperly denied a defense challenge for cause of a juror.
[4] Officer Lauer testified he took this sample, shown in exhibit S-16, from the interior and exterior of this window sill. It was stipulated the blood sample in S-16 was type "B". The appellant later testified he had type "B" blood.